# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | *     CR. 13-30028-RAL |
| Plaintiff, | * |
| -vs- | *   REPORT AND RECOMMENDATION<br>* CONCERNING MOTION TO SUPPRESS<br>*     EVIDENCE AND STATEMENTS |
| JASON LONG, | * |
| Defendant. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### SUMMARY

In this drug case, Jason Long seeks to suppress evidence seized, on two separate occasions, from his commercial establishment and the statements he made to tribal officers on Fourth and Fifth Amendment as well as *Miranda* grounds and under the "fruit of the poisonous tree" doctrine. Because some of the evidence is excludable, but other evidence and his statements are not, the Court recommends that Long's suppression motion be granted in part and denied in part.

### BACKGROUND

On July 28, 2012, at about 4:20 a.m., Bureau of Indian Affairs (BIA) Officer Shane Spargur stopped three individuals in Lower Brule, South Dakota, who he suspected were juveniles out past curfew. It was dark out and the three individuals had toy air-soft guns and fireworks. Because fireworks were no longer allowed on the reservation, Spargur

asked where they got the guns and fireworks. One of the three told Spargur that he had

just bought the items at the OC Store, a novelties establishment, located approximately two

blocks away, that Long operated. Officer Spargur confiscated the fireworks from the

individuals and proceeded to the store to talk to Long about selling fireworks after the 4th

of July.

Officer Spargur arrived at the store sometime around 4:30 a.m. As he approached

the building that housed the store, he could see lights on and could hear music coming

from within. He opened the unlocked screen and front doors, adjacent to the parking lot,

and walked into the vestibule area of the building. He then knocked and announced

"Police" a couple of times. When no one answered, he pushed open the interior door,

which likewise was not locked, identified himself and called for Long. Upon seeing Long's

minor son, Jason, Jr., inside, Officer Spargur entered the store and walked back to the

concession area of the same. There, he came in contact with Long's adult son, Freedom,

sitting at one of the dining tables. Officer Spargur related that he was following up on

information given to him that the store had sold fireworks to a named individual that

night. Freedom acknowledged that the individual had been in the store, but must have

stolen the fireworks because none had been sold. In response, Officer Spargur asked to

speak to Long. Freedom indicated that Long was sleeping in a different room. Officer

Spargur requested that Freedom go get Long. Freedom complied, and left the concession

area.

2

While waiting for Freedom to return, Officer Spargur observed a small red and black resealable pouch, approximately three inches by three inches in size, sitting on a dining room table. He recognized the package and believed it contained synthetic marijuana. Freedom returned and told Officer Spargur that Long was sleeping. Officer Spargur again requested to speak to Long and directed Freedom to go wake Long up. Eventually Long came out from where he was sleeping and Officer Spargur confronted him about selling fireworks out of season. Long said he knew that he was not supposed to sell fireworks after July 4th. But before Long could say anything more, Freedom, who was also present, interrupted and reiterated that the individual who obtained the fireworks must have stolen them. Officer Spargur thanked Long, apologized for waking him up and left the store without taking anything.

While in the parking lot of the store, Officer Spargur called the chief of police, Joel Chino, and told him about the package he saw inside the store and that he believed Freedom was under the influence of some kind of substance. After confirming through research that the package was probably not herbal shisha (a legal, tobacco-like, product), Officer Spargur prepared an application and affidavit for a warrant to search the store, its curtilage and vehicles associated with Long. He obtained a search warrant from a tribal judge at 7:55 a.m. and executed the same, with other officers, at or shortly after 9:00 a.m. that day.

During the search of the store, including the area of it where Long had been sleeping, officers found five unused wooden dugouts, a wooden pipe, an invoice, a

3

checkbook and license with Long's name on them, packages of "Mad Hatter" incense, a package of "WTF" incense, burnt roaches, mail addressed to Long at the store and a package of "hydro" botanical potpourri like the one Officer Spargur saw earlier on a dining table. Officers also searched a black Chevy Blazer outside of the store, registered to Nancy Big Eagle and Freedom, and seized a package of incense with a picture of "Scooby-Doo" on the front and a plastic container as well. No other vehicles were searched.

Long was present on site when the search warrant was executed and was thereafter arrested and transported to jail. Officer Spargur and BIA Special Agent William Bolling met with Long in the latter's office around noon, once the search had been completed. There, Long was advised of his *Miranda* rights and agreed to talk to the two officers and did so.

Subsequent to the arrest, Vicki Her Many Horses informed police that she was the owner of the building and that she did not want Long, her nephew, there. She also contacted and advised her daughter, Raelynn Her Many Horses, that Long had been arrested, that the store had issues with break-ins, that she could not longer take care of the building and that she was open to selling it to Raelynn. On August 4, 2012, Vicki sold the building to Jacob Brouse, Raelynn's long-standing boyfriend, and executed a bill of sale memorializing the transaction.

Two days later, on August 6, 2012, Raelynn and Brouse discovered that someone had broken into the building. The back door was opened and damaged. They called the police, and an officer came and investigated. Upon completing his investigation, the officer

4

left and Raelynn and Brouse shut the door and went to Chamberlain, South Dakota, to get a lock for the door and wires for the building's security system. Upon their return, they found that someone had gone into the building a second time because the back door was open. They went inside and noticed a $100 bill and a document bearing Long's signature that they had not seen before. Raelynn called the police and BIA Officer Jason La Mons responded. She and Brouse both took Officer La Mons into the building and gave him a tour of the interior that included a backroom area where things had been moved around. Officer La Mons saw and then took, as evidence, a FedEx box with invoices in it, a $100 bill and a complaint form, signed by Long, relating to a prior dispute between Long and Vicki.

After finishing up at the store, Officer La Mons located and spoke to Long at the latter's residence, 23 Spotted Tail in Lower Brule. Officer La Mons asked Long about the complaint form and showed it to him. Long admitted to going into the OC Store to check out his inventory after hearing that the store had been broken into. Based on this admission, Officer La Mons arrested Long and took him to jail. While en route, Long proclaimed his innocence, saying that he just went to the store to check on his stuff. At the jail, Officer La Mons Mirandized Long, using a card to do so. Long said he understood his rights, was not questioned, but kept talking.

Forty-five minutes or so later, Long was interviewed by BIA Special Agent Michael Yellow. The interview took place at the Lower Brule Police Department. Long was informed of his *Miranda* rights, waived them and had a lengthy conversation with Agent Yellow during which Long made incriminating statements.

More than a year following this interview, Long was indicted by a federal grand jury and charged with possession with intent to distribute a controlled substance and to distribute a controlled substance analog, in violation of 21 U.S.C. §§813, 841(a)(1), 846 and 18 U.S.C. §2. He now seeks to suppress:

1.  Officer Spargur's pre-dawn entry into the OC Store on July 28 and what the officer saw while inside;

2.  The evidence obtained that same day, from the store and a vehicle parked outside of it, pursuant to a telephonic search warrant;

3.  The entry into and search of the store on August 6; and

4.  The statements he made to Officer La Mons and Agent Yellow following the August 6 search.

## DISCUSSION

### A. Initial Entry into the Store

At the outset, Long first claims that Officer Spargur illegally entered the OC Store, in the early morning hours of July 28, and made observations therein that violated Long's Fourth Amendment rights. Long argues that there were no exigent circumstances to sanction the entry into the store and that Officer Spargur was only interested in following up on a potential fireworks infraction. Long points out that Officer Spargur's entry was without a warrant and led to the issuance of a search warrant and ultimately to the seizure of evidence that the Government intends to use against him at trial.

Although the Fourth Amendment guarantees the right of the people to be secure in their "houses," this protection is not limited to a person's "home". The Supreme Court has

6

made it clear that stores and other business and commercial premises are entitled to protection under the Amendment.[1] As the Court stated more than four decades ago, "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property."[2]

Admittedly, business and commercial premises are not as private as residential premises.[3] And the Supreme Court has said that "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."[4] Of course, this means "that as an ordinary matter law enforcement officials may accept a general public invitation to enter commercial premises for purposes not related to the trade conducted thereupon."[5] On this basis, courts have consistently held that police officers, even if motivated by an investigative purpose, do not conduct a search by merely entering a business establishment.[6] The implied invitation for customers to enter

---

[1]See Dow Chemical Co. v. United States, 476 U.S. 227, 235 (1986) ("Plainly a business establishment or an industrial or commercial facility enjoy certain protections under the Fourth Amendment."); Marshall v. Barlow's, Inc., 436 U.S. 307, 311 (1978) ("The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes. . . . To hold otherwise would belie the origin of that Amendment and the American colonial experience.").

[2]See v. City of Seattle, 387 U.S. 541, 543 (1967).

[3]See New York v. Burger, 482 U.S. 691, 699 -700 (1987).

[4]Katz v. United States, 389 U.S. 347, 351 (1967).

[5]United States v. Berrett, 513 F.2d 154, 156 (1st Cir. 1975) (per curiam) (citing United States v. Berkowitz, 429 F.2d 921, 925 (1st Cir. 1970)).

[6]See 1 Wayne R. LaFave, Search & Seizure, §2.4(b), nn. 57-73 at pp. 817-18 (5th ed. 2012)

though extends only to those times when the premises are in fact "open to the public."[7] The fact that a business is open to the public at certain times does not mean that the police may enter on other occasions.[8]

Officer Spargur entered the OC Store without a warrant or consent at a time when the store was closed to the public. It was in the wee hours of the morning (and still dark out) when he decided to investigate within. He was not in hot pursuit of a fleeing suspect and there was no exigency present to justify not getting a warrant.[9] And he did not go into

---

[7]*See Maryland v. Macon*, 472 U.S. 463, 469 (1985); *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984); *See*, 387 U.S. at 545; *United States v. Swart*, 679 F.2d 698, 701-02 (7th Cir. 1982); *State v. Foreman*, 662 N.E.2d 929, 933-34 (Ind. 1996); *see also United States v. Bute*, 43 F.3d 531, 537 (10th Cir. 1994) (there is a greater expectation of privacy in commercial premises after business hours when no employees are present, than when the premises is open); *compare United States v. Sandoval-Vasquez*, 435 F.3d 739, 743 (7th Cir. 2006) ("police entry of iron works not a search as 'at the time of entry, the door through which customers entered was open, the garage door was open, and the establishment was still open for business'").

[8]*See Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 845 (10th Cir. 2005) (commercial proprietor's right to be free from inspector's after-hours, unconsented and warrantless searches for building code violations was clearly established when entries into business were made); *O'Rourke v. Hayes*, 378 F.3d 1201, 1207-08 (11th Cir. 2004) (entry of medical office was a search because office was not yet open to the public); *Swart*, 679 F.2d at 701 ("Commercial establishments do not extend an implicit invitation to enter during non-business hours or when there are no employees on the premises."); *Foreman*, 662 N.E.2d at 933-34 (it was a search when officer entered room adjoining bingo center because room was not open to the public, notwithstanding the fact that room was open to general public during business hours); *People v. Ramsey*, 272 Cal. App. 302, 309-311, 77 Cal. Rptr. 249, 254-55 (1969) (entry into auto repair shop at 7:45 a.m., when shop was closed, was an illegal search).

[9]*See Kentucky v. King*, 131 S.Ct. 1849, 1856-57 & n.3 (2011); *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *United States v. Santana*, 427 U.S. 38, 42-43 (1976).

8

the store as part of a security check to protect Long or someone else's property.[10] Although lights and music could be seen and heard inside, the doors were all closed and there was no illuminated signage or other indication that the store was open for business. As the proprietor of a commercial establishment that was closed for the night and not open to the public, Long had a legitimate expectation of privacy in the interior and the contents of the store.[11]

Officer Spargur's entry, through three doors, and observations inside the store itself, constituted an illegal search in violation of the Fourth Amendment. Indeed, the Court is hard pressed to think of a situation where society would be more likely to recognize a business owner's expectation of privacy in his store at approximately 4:30 a.m. when the store and the doors to it are closed to the public and the owner is fast asleep inside. The owner, like the occupant of a residence, has a constitutional right to be free from

---

[10]See Bute, 43 F.3d at 535-40 (refusing to apply security check and protection of property exceptions to justify warrantless entry and search of a commercial premises); see and compare Illinois v. Gardner, 121 Ill. App.3d 464, 466, 470, 459 N.E.2d 676, 678, 680-81 (1984) (4:00 a.m., auto repair shop closed but unlocked; proper to enter "to secure the premises and *** take necessary measures to ascertain the identity of the proprietor"); State v. Myers, 601 P.2d 239, 244 (Alaska 1979) ("law enforcement personnel may enter commercial premises without a warrant only when, pursuant to routine after-hours security check undertaken to protect the interests of the property or where it is discovered that the security of the premises is in jeopardy, and only when there is no reason to believe that the owner would not consent to such an entry"); California v. Parra, 30 Cal. App. 729, 731-33, 735 106 Cal. Rptr. 531, 534-35 (upholding warrantless entry and search of commercial building motivated by desire to secure premises and the "emergency presented by the discovery of an unlocked business premises"), cert. denied, 414 U.S. 1116 (1973).

[11]See Smith v. Maryland, 442 U.S. 735, 740 (1979).

unreasonable official entries upon his private commercial property.[12]  If the Government

intrudes on the owner's property, privacy interests and the Fourth Amendment are

implicated,  requiring either a warrant or some recognized exception if none has been

procured.[13]

Inasmuch as Long had a reasonable expectation of privacy in the OC Store and there

was no consent, court-approved authorization or other basis to be on the premises, the

warrantless entry and search of the store were unlawful.

## B. Telephonic Search Warrant and the "Good Faith" Exception

Does this mean that the evidence observed initially in the OC Store and seized later

on, consonant with a telephonic search warrant, must be suppressed?  The short answer

is "yes".

Ordinarily, "[e]vidence obtained in violation of the Fourth Amendment is subject

to the exclusionary rule and, therefore, 'cannot be used in a criminal proceeding against the

victim of the illegal search and seizure.'"[14] But because exclusion is a prophylactic remedy,

there are some instances where a Fourth Amendment violation does not trigger this rule.[15]

One exception to the exclusionary rule, often referred to as the "*Leon* exception",

comes into play "when an officer acting with objective good faith has obtained a search

---

[12]*See Marshall*, 436 U.S. at 312.

[13]*See id*. at 312-13.

[14]*United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011) (*quoting United States v. Calandra*, 414 U.S. 338, 347 (1974)), *cert. denied*, 132 S.Ct. 1065 (2012).

[15]*See Davis v. United States*, 131 S.Ct. 2419, 2426-27 (2011).

warrant from a judge or magistrate and acted within its scope," even if the warrant is subsequently invalidated.[16] This exception is based on the theory that "where there has been no police illegality, there is no conduct [ ] courts need to deter and therefore no basis to enforce the [ ] rule."[17] As the Supreme Court has stated: "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations."[18] The determinative question is whether the officer "had an objectively reasonable basis to believe [he was] complying with [applicable law] and the Fourth Amendment."[19] For the exception to apply when the warrant is based on evidence obtained in violation of the Fourth Amendment, the officer's pre-warrant conduct must have been "close enough to the line of validity to make [his] belief in the validity of the warrant objectively reasonable."[20] If "the officer['s] pre-warrant conduct is 'clearly illegal,' the [ ] exception does not apply."[21]

This case falls in the latter category. The method by which Officer Spargur obtained the information he testified to in support of the telephonic search warrant was clearly

---

[16]*United States v. Leon*, 468 U.S. 897, 920-21 (1984).

[17]*United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).

[18]*Leon*, 468 U.S. at 921.

[19]*United States v. Moore*, 956 F.2d 843, 848 (8th Cir. 1992).

[20]*United States v. Cannon*, 703 F.3d 407, 413 (8th Cir.) (*quoting United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989), *cert. denied*, 498 U.S. 825 (1990)), *cert. denied*,133 S.Ct. 2375 (2013)

[21]*Cannon*, 703 F.3d at 413 (*quoting United States v. O'Neal*, 17 F.3d 239, 242-43, n. 6 (8th Cir.), *cert. denied*, 513 U.S. 960 (1994)).

11

illegal.[22]  And when the offending information is excised, and the officer's testimony

considered in redacted form, there is nothing left to legitimate the tribal judge's probable

cause finding.[23]  This is because the warrant was not only based, but was also wholly

dependent on, information that was gathered in clear violation of the Fourth Amendment.[24]

Significantly, Officer Spargur sought and was issued a warrant for evidence relating to

drugs, not fireworks.  No officer, in his position, could have reasonably believed that such

a warrant, premised on an earlier unlawful entry and "look-see" inside the OC Store, was

---

[22]*See Conner*, 127 F.3d at 667; *O'Neal*, 17 F.3d at 242-43, n. 6.

[23]*See United States v. Madrid*, 152 F.3d 1034, 1040 & n.7 (8th Cir. 1998); *United States v. Templeman*, 938 F.2d 122, 124-25 (8th Cir. 1991); *see also Franks v. Delaware*, 438 U.S. 154, 156 (1978) (if, after being redacted, affidavit's remaining content is insufficient to establish probable cause, search warrant (upon which affidavit was based) must be voided and fruits of search excluded to the same extent as if probable cause was lacking on the face of affidavit).

[24]*See Madrid*, 152 F.3d at 1040-41; *Conner*, 127 F.3d at 667-68; *O'Neal*, 17 F.3d at 244; *United States v. Marts*, 986 F.2d 1216, 1219 (8th Cir. 1993); *see also Murray v. United States*, 487 U.S. 533, 542 (1988) ("The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here.  This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the [m]agistrate and affected his decision to issue the warrant."); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 390-92 (1920) (where federal officers unlawfully seized certain documents and then, after court ordered them returned, subpoenaed the same documents; subpoenas were invalid because they were based on knowledge obtained from illegally seized evidence); *Fultz v. State*, 333 Ark. 586, 594, 972 S.W.2d 222, 225 (1998) (search warrant can be defeated if officer's motivation for warrant arose from evidence discovered earlier during illegal search); *State v. Winkler*, 552 N.W.2d 347, 354 (N.D. 1996) (notwithstanding fact that evidence other than that obtained in prior unlawful search established probable cause for search warrant, remand was necessary for a determination of whether officers' decision to seek warrant was caused by what they saw during unlawful entry").

valid, or that the search and seizure conducted pursuant to the warrant, was constitutionally permissible. Stated differently, his conduct at the store, before his warrant request was made and approved, was not "close enough" to the prescribed line to make his belief in the efficacy of the warrant objectively reasonable.[25]

In *Leon*, the case that created the exception and that the Government seeks now to invoke, the police did not ever violate the law. They simply relied in good faith on a magistrate's error. In Long's case, however, there was (1) an illegal entry of his store and observations made of items in the interior of it; and (2) oral testimony, in support of a search warrant request, which relied exclusively on the prior entry and observations.

Deterrence, *Leon* holds, is not needed to remedy judicial errors. But police misconduct must be deterred through the suppression of evidence. "Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble."[26]

Officer Spargur's presumptively unconstitutional entry into and search of the OC Store was an unequivocal Fourth Amendment transgression. *Leon* instructs courts to pay "[c]lose attention" to the "remedial objectives" of the exclusionary rule, and apply it only in those cases where the purpose of deterrence can be furthered.[27] This is precisely such

---

[25]*See Conner*, 127 F.3d at 667; *O'Neal*, 17 F.3d at 242-43, n.6; *compare Cannon*, 703 F.3d at 413-14; *United States v. Fletcher*, 91 F.3d 48, 52 (8th Cir. 1996), *cert. denied*, 520 U.S. 1121 (1997).

[26]*United States v. Reilly*, 76 F.3d 1271, 1280 (2d. Cir. 1996).

[27]*Leon*, 468 U.S. at 908, 918.

a case.[28]  It is not, as *Leon* was, a case where an officer acted in objective good faith in obtaining a warrant to search a commercial establishment.[29]  Instead, it was an attempt to sanitize illegal behavior that had just occurred, collect additional fruits and skirt the tentacles of the rule.[30]  The Court is unwilling to provide Officer Spargur, police and the Government with their magic lamp and allow them to use it to avoid the harsh penalty of suppression.

All of the evidence tribal police seized from the OC Store, under the auspices of the July 28 telephonic warrant, must be suppressed as the poisonous fruit of an illegal search. To apply *Leon's* good-faith exception to the fruits of an unlawful entry – because officers later obtained a warrant based on the entry and what an officer earlier saw inside the place sought to be searched – would effectively allow the exception to swallow the rule itself. While pared down by *Leon* and other cases, the rule has not been eliminated and still is available to deter police misconduct that runs afoul of the Fourth Amendment.

---

[28]*See Madrid*, 152 F.3d 1040-41; *Conner*, 127 F.3d at 667-68; *O'Neal*, 17 F.3d at 244; *Marts*, 986 F.2d at 1219.

[29]*See Leon*, 468 U.S. at 920-21.

[30]*See O'Neal*, 17 F.3d at 242-43, n.6; *cf. United States v. Leveringston*, 397 F.3d 1112, 1114-15 (8th Cir.) (not sufficient, under independent source doctrine, for reviewing court to infer from circumstances that police inevitably would have sought warrant even without the illegally obtained information; when government seeks to rely on this doctrine in case involving a later-obtained warrant, it should present specific evidence that officer was not prompted by unlawful activity to obtain warrant, and should seek a finding on that point), *cert. denied*, 546 U.S. 862 (2005).

## C. Vehicle Search

What about the search of the Chevy Blazer that was parked outside of the OC Store – is the evidence found in it likewise subject to suppression under the exclusionary rule? The Government submits that Long has no standing to challenge the search and the Court agrees.

The Fourth Amendment protects people against unreasonable searches of "their" effects, and an accused in a criminal case may not vicariously assert the rights of a third party under this Amendment.[31] In moving to suppress the items found in the Blazer, Long has the burden of proving that he personally has an expectation of privacy in the vehicle and that this expectation is objectively reasonable.[32] He makes no argument that he has a reasonable expectation of privacy in the Blazer or its contents. The reason why is obvious: He himself has no ownership, possessory or privacy interest in the vehicle; nor does he assert any in the property taken from the same. This being the case, he is foreclosed from complaining about the vehicle search or the evidence seized as part of it.[33]

---

[31]*See Rawlings v. Kentucky*, 448 U.S. 98, 104-08 (1980); *Rakas v. Illinois*, 439 U. S. 128, 133-38 (1978); *United States v. Crippen*, 627 F.3d 1056, 1063 (8th Cir. 2010) (*citing United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004), *cert. denied*, 131 S.Ct. 2914 (2011)); *United States v. Washington*, 197 F.3d 1214, 1216 (8th Cir. 1999) (*citing Alderman v. United States*, 394 U.S. 165, 174 (1969)), *cert. denied*, 531 U.S. 1015 (2000).

[32]*See Rakas*, 439 U.S. at 143-44 & n.12; *Barragan*, 379 F.3d at 529; *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995).

[33]*See Rakas*, 439 U.S. at 148-49; *Barragan*, 379 F.3d at 530; *United States v. Payne*, 119 F.3d 637, 641-42 (8th Cir.), *cert. denied*, 522 U.S. 987 (1997); *see also United States v. Parada*, 577 F.3d 1275, 1280 (10th Cir. 2009) (defendant lacked standing regarding the search of
(continued...)

## D. Franks Hearing

In view of the Court's ruling with respect to the suppression of the items seized in the OC Store and the Chevy Blazer, there is no need for a *Franks* hearing[34] to (1) challenge the validity of the telephonic search warrant or (2) determine whether Officer Spargur made false statements or omitted material information knowingly and intentionally, or with reckless disregard for the truth, in connection with the warrant application process. Long's motion, to the extent that it seeks a hearing and relief under *Franks*, is denied as moot.

## E. Subsequent Entry and Search of the Store

By way of supplement to his motion, Long claims that Officer La Mons's warrantless entry into and search of the OC Store on August 6 violated the Fourth Amendment and requires that any evidence obtained therefrom be suppressed. The Government counters

---

[33](...continued)
cooler lawfully found in car, as he "neither testified at the suppression hearing nor presented any evidence establishing his possessory interest in the cooler"), *cert. denied*, 560 U.S. 927 (2010); *United States v. Goshorn*, 628 F.2d 697, 700-01 (1st Cir. 1980) (where defendant did not own car, was not present in car at the time of search, and, with respect to bags in trunk, failed to show either that he had placed them in trunk or that he had some possessory interest in their contents); *State v. Bruns*, 172 N.J. 40, 56-59, 796 A.2d 226, 236-38 (2002) (where defendant was not a passenger and had no proprietary or possessory right in vehicle searched and record contained no evidence to support contention that he retained any interest in weapons found at time of search).

[34]*See Franks*, 438 U.S. at 155-56 (a defendant is entitled to a hearing to challenge the veracity of statements used to secure a search warrant when he makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was made in the warrant affidavit and the statement is necessary to the finding of probable cause).

that the entry and search were consensual and therefore reasonable under the Amendment.

Consent is valid "when an officer reasonably relies on a third party's demonstration of apparent authority" over the premises.[35] "Apparent authority exists when 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'"[36] "[S]urrounding circumstances could conceivably be such that a reasonable person would doubt" another's consent "and not act upon it without further inquiry."[37] "Some circuits have . . . require[d] police to go behind appearances to verify third party authority."[38] The Eighth Circuit, however, "has been more liberal about allowing police to form their impressions from context."[39] Circuit precedent reflects that a police officer is entitled to draw an inference

---

[35]*United States v. Lindsey*, 702 F.3d 1092, 1096 (8th Cir.) (*quoting United States v. Amratiel*, 622 F.3d 914, 915 (8th Cir. 2010), *cert. denied*, 131 S.Ct. 1544 (2011)), *cert. denied*, 133 S.Ct. 2842 (2013); *see also United States v. Matlock*, 415 U.S. 164, 171 (1974) ("[A] third party who possesse[s] . . . [a] sufficient relationship to the premises [may give consent]. . . .").

[36]*Amratiel*, 622 F.3d at 916 (*quoting Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990)).

[37]*Rodriguez*, 497 U.S. at 188.

[38]*United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) (*citing United States v. Cos*, 498 F.3d 1115, 1128-31 (10th Cir. 2007) and *United States v. Whitfield*, 939 F.2d 1071, 1074-75 (D.C. Cir. 1991)).

[39]*Lindsey*, 702 F.3d at 1096 (*quoting Almeida-Perez*, 549 F.3d at 1171); *see also Almeida-Perez*, 549 F.3d at 1164-65 (consent to a search was valid where man on front porch led police officers "into the house without knocking" after officers asked if they could talk inside even though they did not inquire further or ask "whether he 'had any interest in the house.'"); *United States v. Hilliard*, 490 F.3d 635, 639 (8th Cir. 2007) (consent was valid where woman allowed officers inside and showed "familiarity with the premises"); *United States v. Weston*, 443 F.3d 661, 668 (8th Cir.) (where defendant's

(continued...)

from what he sees, hears and knows unless there are other circumstances that would cause a reasonable officer in his position to doubt the validity of that inference.[40] This concept is in accord with the Supreme Court's reasoning that "it would be unjustifiably impractical to require [a] police [officer] to take affirmative steps to confirm the actual authority of [ ] consenting individual[s] whose authority was apparent."[41]

At the time Officer La Mons entered, Brouse owned the building that housed the OC Store, having purchased it from Vicki two days earlier.[42] It is unclear whether Officer La Mons knew this, and he may have believed that Vicki was still the owner. Vicki had called and talked to him "many times" since the July 28 search and told him that she had

_____

[39](...continued)
ex-wife was at his trailer, even though he was not, police could rely on appearance that she was in charge), *cert. denied*, 549 U.S. 956 (2006); *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (police did not violate Fourth Amendment where friend of defendant entered house without knocking, gestured for police to follow her in, and referred to a room as "her room"; officers had no reason to doubt friend's authority to invite them into house); *United States v. Pennington*, 287 F.3d 739, 746-47 (8th Cir.) (no Fourth Amendment violation where man named Vickery was in defendant's house, tossed a Crown Royal bag to police officer who looked inside and found drugs; officer was entitled to infer from Vickery's exercise of dominion over bag that it was his bag), *cert. denied*, 537 U.S. 1022 (2002); *Iron Wing v. United States*, 34 F.3d 662, 665 (8th Cir. 1994) (police officers acted permissibly in letting defendant's sister-in-law admit them to his house, even though she had no key and had to crawl in window; officers were entitled to rely on her statement that she lived at house and had left her bedroom window unlocked, which was corroborated when she was able to open it up).

[40]*See Lindsey*, 702 F.3d at 1097; *Amratiel*, 622 F.3d at 916-17; *Almeida-Perez*, 549 F.3d at 1170-71.

[41]*Georgia v. Randolph*, 547 U.S. 103, 122 (2006) (*discussing Rodriguez*).

[42]*See* Mtn. Hrg. Ex. 18; *see also* Mtn. Hrg. Tr. 290, 298, 301, 303-04, 306.

18

"trespassed" Long from the store and that she did not want him there anymore.[43]  In their

telephone conversations, she also said that she wanted police "to respond to any break-ins,

concerns" at the building.[44]  When Officer La Mons arrived on scene, both Raelynn (Vicki's

daughter) and Brouse (Raelynn's boyfriend) gave the officer permission to enter the

building and investigate what appeared to be a break-in.[45]  Raelynn was the one who, at

Brouse's direction, had called police and reported the break-in.[46]  She and Brouse then

ushered Officer La Mons into the building, showed him around and pointed out what they

had earlier discovered.[47]  The two likewise informed the officer that they had been in the

building that morning, in response to a prior break-in, and after meeting with another

officer, had closed the back door, only to find it kicked open when they returned.[48]

As of August 6, Brouse owned, had access to and control of the building and thus

had common or "actual" authority to consent to the entry and search of the same.[49]  But

even if Brouse lacked this authority, the Fourth Amendment was not violated because

Officer La Mons could reasonably rely on Raelynn, Brouse, and Vicki's apparent authority

---

[43]Mtn. Hrg. Tr. 139-142, 150-152.

[44]See id. at 153.

[45]See id. at 290-91, 302.

[46]See id. at 290, 299, 302.

[47]See id. at 138, 165-66, 289-90.

[48]See id. at 137-38, 154, 166, 189-90, 286-89.

[49]See United States v. McGuire, CR. 13-40058-01-KES, 2013 WL 6449893 at *3
(D.S.D. Dec. 10, 2013).

to consent. Together, they possessed all of the indicia of ones who had the authority to admit the officer into a building that they had an interest in. On this record, Officer La Mons could be confident in what they demonstrated, vis-à-vis their statements and conduct, and reasonably believe that – collectively – they could provide valid consent.[50] The officer's warrantless entry and search of the building, therefore, was reasonable, under the Fourth Amendment, even though Long did not consent to the same.

Long contends that he leased the building from his aunt, Vicki, who was his landlord. No definitive evidence, however, was ever presented to support this contention. The only two people who would know, for sure, whether there was a lease or not are Long and Vicki, neither of whom testified at the suppression hearing. While Long did operate the OC Store out of the building, no evidence was offered to indicate what, if any, arrangement or agreement he and Vicki had.[51] Nor was there any proof to show that Long, on August 6, was a tenant or even that he had a continuing right to use, much less occupy, the premises.[52] Given what he knew and could infer from the words and deeds of others, Officer La Mons could reasonably assume that he had authority – without making further

---

[50]*See Almeida-Perez*, 549 F.3d at 1164-65; *Hilliard*, 490 F.3d at 639; *Weston*, 443 F.3d at 668; *Janis*, 387 F.3d at 687; *Iron Wing*, 34 F.3d at 665; *McGuire*, 2013 WL 6449893 at *3.

[51]*See* Mtn. Hrg. Tr. 151-52, 154-55, 292, 301, 304.

[52]*See id*. at 138-39, 150-52, 283, 291-92, 294, 301, 304.

inquiry – to enter and look into the circumstances surrounding the break-in of the

building.[53]

---

[53]*See Randolph,* 547 U.S. at 112 (police cannot rely on assumption that people hew to conventional arrangements when "atypical arrangements" may be apparent from what they see and hear); *Rodriguez,* 497 U.S. at 188-89 (discussing *Stoner v. California,* 376 U.S. 483 (1964) and *Chapman v. United States,* 365 U.S. 610 (1961) and holding that consent to enter must be judged by an objective standard, that is, whether officers could reasonably believe that third party had authority to consent); *see also United States v. Brokaw,* 985 F.2d 951, 954 (8th Cir.) (holding that consent to search a trailer given by property owner was sufficient), *cert. denied,* 501 U.S. 913 (1993); *United States v. King,* 627 F.3d 641, 646-48 (7th Cir. 2010) (cook, who police knew was not owner, had apparent authority to consent to search of restaurant, as he appeared to have "full control over the premises" and "opened the restaurant alone"); *United States v. Law,* 528 F.3d 888, 904 (D.C. Cir. 2008) (landlord can consent to the search of an unleased premises; and even if landlord does not have authority to consent, agents may rely on her assurance that she has such authority if objective circumstances make reliance reasonable), *cert. denied,* 555 U.S. 1147 (2009); *United States v. Brazel,* 102 F.3d 1120, 1148-49 (11th Cir.) (detective's search of defendant's apartment did not violate Fourth Amendment where detective had objectively reasonable good faith belief that premises were vacant and that he had received valid consent from landlord), *cert. denied,* 522 U.S. 822 (1997); *United States v. Elliot,* 50 F.3d 180, 187 (2d Cir. 1995) (any error with respect to landlord's authority to consent to entry and search of dwelling unit was a mistake of fact since it turned on and resulted from officers' ignorance of the actual arrangements made between landlord and tenant), *cert. denied,* 516 U.S. 1050 (1996); *United States v. Derden,* Crim. 12-12(PJS/SER), 2012 WL 1952257 at **8-10 (D. Minn. April 16, 2012), *report and recommendation adopted,* 2012 WL 1948765 (D. Minn. May 30, 2012) (police could reasonably rely on homeowner's apparent authority to consent to entry of basement area rented to her daughter's boyfriend); *State v. Brown,* 35 So.3d 1069, 1070, 1074 (La. 2010) (where resident of one side of duplex said her grandmother "owned both units and had given her [ ] control over the entire building" and also that persons within other unit "were trespassers", officers could reasonably rely on this information); *People v. Superior Court,* 3 Cal. App.3d 648, 658-59, 83 Cal.Rptr. 732, 738-39 (1970) (where police officer had reasonable belief that landlord had actual authority to consent to entry into apartment and to seizure of marijuana because landlord had repossessed premises; officer had no duty to ascertain legality of alleged eviction before acting on landlord's consent); *compare United States v. James,* 353 F.3d 606, 615 (8th Cir. 2003) (police cannot reasonably rely on party's apparent authority when they know what that party's actual authority is); *State v. Sodoyer,* 156 N.H. 84, 85-86, 931 A.2d 548, 549-51 (2007) (since police

(continued...)

21

### F. August 6 Statements

Long next claims that his statements to Officer La Mons and Agent Yellow on August 6 should be suppressed because they were involuntary and made without a valid waiver of his rights. His claim though is without merit, lacking both a factual foundation and a legal basis for relief.

The Supreme Court in *Miranda v. Arizona*[54] held that when a person is taken into custody for questioning, he must be warned of his right to remain silent, to be free from self-incrimination and to talk to or have a lawyer present during questioning.[55] These warnings are required before questioning "whenever a suspect is (1) interrogated, (2) while in custody."[56] "Interrogation" is the "direct questioning" or "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[57] "Custody" occurs, for purposes of *Miranda*, when there has been "a formal arrest or restraint on freedom of movement of the degree

---

[53](...continued)
knew all relevant facts, e.g., that consenting party "was no longer in residence" and "was only nominally responsible for the premises because the lease still bore his name" (which was insufficient to show actual authority), there was no apparent authority for search).

[54]384 U.S. 436 (1966).

[55]*Id.* at 444.

[56]*United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990).

[57]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

associated with the formal arrest."[58]  The relevant factors that must be considered in the custody determination "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the [suspect] at the end of the questioning [ ]."[59]

The Fifth Amendment prohibits the introduction of voluntary statements at trial.[60] A statement is voluntary if it is "the product of an essentially free and unconstrained choice by its maker."[61]  Conversely, "[a] statement is involuntary when it [is] extracted by threats, violence, or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination."[62]

A suspect, after being properly warned, may waive his *Miranda* rights.  But the waiver must be voluntary, knowing and intelligent, which means, it must be "the product of a free and deliberate choice rather than intimidation, coercion or deception," and the

---

[58]*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*).

[59]*Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (citations omitted).

[60]*See Chavez v. Martinez*, 538 U.S. 760, 769 (2003); *United States v. LeBrun*, 363 F.3d 715, 719-20 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145 (2005); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (voluntary confession may be used against suspect, but an involuntary one offends due process).

[61]*Schneckloth*, 412 U.S. at 225.

[62]*LeBrun*, 363 F.3d at 724 (*quoting Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir.), *cert. denied*, 534 U.S. 924 (2001)).

suspect must have a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[63]

## 1.   Statements to Officer La Mons

Long's statements to Officer La Mons were made voluntarily and in compliance with the dictates of *Miranda*. The officer went to Long's residence (23 Spotted Tail) without any intention of making an arrest. The two had a consensual encounter outside of the officer's vehicle, which Long was at liberty to decline or terminate at any time. Long was neither handcuffed nor restricted in his movements. Officer La Mons asked about and showed Long a complaint form the officer found in the OC Store. Long replied that he had received calls that his store had been broken into and then admitted that he went into the store to check on his inventory. Based on this admission, Officer La Mons arrested Long. Up to the time of the arrest, a reasonable person in Long's position would not have perceived that his freedom of action was deprived in a manner akin to a formal arrest. Long therefore was not in custody and entitled to *Miranda* warnings.[64]

---

[63]*Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979) ("[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel.").

[64]*See United States v. Vinton*, 631 F.3d 476, 481 (8th Cir.), *cert. denied*, 132 S.Ct. 213 (2011); *United States v. Czichray*, 378 F.3d 822, 826-30 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005); *LeBrun*, 363 F.3d at 720-24.

Following the arrest, Officer La Mons Mirandized Long but never engaged in any substantive questioning of him. Long talked on his own "constantly" before and after the *Miranda* advisement, continuing to "plead his innocence."[65] Eventually, the officer turned Long over to corrections staff who lodged him into the jail.

Long's post-arrest statements were made spontaneously and without any interrogation within the meaning of *Miranda*. Officer La Mons did not query Long in an effort to draw out inculpatory responses from him. Because Long's statements were volunteered and unsolicited, they fell outside the protection of *Miranda* so as to make warnings unnecessary. The statements are therefore admissible as evidence in the Government's case-in-chief at trial.[66]

## 2. Statements to Agent Yellow

About two hours and forty-five minutes later, on August 6, Agent Yellow interviewed Long at the jail. Long was advised of his *Miranda* rights, from an advice of rights form, said that he understood his rights, signed the waiver portion of the form, and spoke with the agent.

---

[65]Mtn. Hrg. Tr. 144-45, 148, 172, 189.

[66]*See Miranda*, 384 U.S. at 478; *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005); *United States v. Waloke*, 962 F.2d 824, 829 (8th Cir. 1992); *United States v. LaRoche*, CR. 08-30056-01-KES, 2008 WL 4224782 at *5 (D.S.D. Sept. 9, 2008); *United States v. Tail*, CR. 04-50026-01-KES, 2005 WL 2114227 at *3 (D.S.D. Aug. 31, 2005), *aff'd*, 459 F.3d 854 (8th Cir. 2006).

At some point during the interview, Long began crying and asked if he could go back to his cell.  In response, Agent Yellow informed Long that he could and requested someone from the jail to come get him.  The agent then told Long "I think they're ready for you."[67]  When the corrections officer arrived, the agent announced that "he's all done," and attempted to confirm with Long that he was "done talking."[68]  Long though was not ready to halt the conversation and quickly asked whether there was "anything else" the agent wanted to know[69] and, by doing so, reopened the dialogue.  The agent did not force Long to keep talking.  In fact, it was the agent who finally chose to end the interview after Long engaged in a four-minute soliloquy.

Until 2010, the Supreme Court had not stated whether an invocation of the right to remain silent could be ambiguous or equivocal.  But when finally called upon to answer this question, the Court held that there was "no principled reason to adopt different standards for determining when [a suspect] has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel . . . ."[70]  According to the Court, a suspect who wants to invoke his right to silence and end an interview, must do so unambiguously.[71]  Requiring that there be "an unambiguous invocation of *Miranda* rights results in an objective inquiry

---

[67]Mtn. Hrg. Ex. 17 at 55:17-19.

[68]*Id*. at 55:26-35.

[69]*Id*. at 55:36-44.

[70]*Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

[71]*See id.*

that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity."[72]

Long did not say that he wanted to remain silent, that he did not want to talk with Agent Yellow anymore or that he wanted to end the interview. Had he made any of these simple, unequivocal statements (rather than asking if he could go back to his cell), he would have invoked his right to cut off questioning. Because he did neither, there was no "critical safeguard" for the agent to "scrupulously honor."[73]

In any event, the audio recording irrefutably shows that Long waived his right to remain silent. First, there is no contention that he did not understand his rights; and from this, it follows that he knew what he gave up when he spoke.[74] There is also more than enough evidence in the record to conclude that he understood his rights. He was read and acknowledged understanding each of his rights and agreed to be questioned without a lawyer present.

Second, if Long wanted to remain silent, he could have walked out of the room with the corrections officer and returned to his jail cell. The fact that he chose not to and reengaged Agent Yellow in conversation demonstrates a willingness to waive his rights.

---

[72]*Id.* at 381-82 (*quoting Davis v. United States*, 512 U.S. 452, 458-59 (1994)).

[73]*Berghuis*, 560 U.S. at 381-82.

[74]*See Burbine*, 475 U.S. at 421.

Third, there is no evidence that Long's statements were coerced.[75] At no time did Agent Yellow ever threaten, promise, mislead, cajole, or force Long to do anything. Nor did the agent employ physical punishment, brandish his weapon or employ deception or trickery to get Long to talk. And while with the agent, Long was not under the influence of alcohol or drugs and nothing he said or did intimated that he suffered from any form of mental incapacity, was low functioning or particularly suggestible and vulnerable to questioning by authority figures.

This is not one of those "rare" instances in which a suspect, after being properly advised of his *Miranda* rights, failed to make an open and autonomous decision to speak with a probing agent and incriminate himself.[76] Long's statements were made voluntarily and after a valid waiver of his *Miranda* rights, including his right to remain silent.[77]

## G. Fruit of the Poisonous Tree

Long's last claim, that all the evidence in this case should be suppressed because it was obtained in violation of his constitutional rights, can be disposed of in short order. Some of the evidence was garnered in accord with Fourth and Fifth Amendment strictures. The evidence that was not, namely, what was observed in, searched for and seized from the OC Store on July 28, was not a "but for" cause of the August 6 search and seizure or the

---

[75]*See id.*

[76]*See Dickerson v. United States*, 530 U.S. 428, 444 (2000).

[77]*See Berghuis*, 560 U.S. at 382-89; *United States v. Morgan*, 729 F.3d 1086, 1092 (8th Cir. 2013); *United States v. Allman*, CR. 12-30056-RAL, 2012 WL 3190780 at **4-5 (Aug. 3, 2012).

statements Long made that day.[78] In other words, the evidence police officers collected and

which Long provided them on August 6 was not "come at by exploitation" of the July 28

illegality, but instead by means distinguishable so as to be purged of the primary taint.[79]

But even if there was a causal connection between the events of these two days, the search

conducted and the statements given on August 6 were sufficiently attenuated from the

Fourth Amendment violations nine days before that the former are not subject to

suppression under the exclusionary rule.[80] Long's "fruit of the poisonous tree" claim thus

provides him with no traction from preventing the Government from using the August 6

evidence (that tribal police acquired from the store) and statements (that he gave) at trial.

---

[78]*See Hudson v. Michigan*, 547 U.S. 586, 592 (2006); *Segura v. United States*, 468 U.S. 796, 815 (1984); *Riesselman*, 646 F.3d at 1079; *United States v. Marasco*, 487 F.3d 543, 547-48 (8th Cir. 2007); *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir.) *(en banc)*, *cert. denied*, 483 U.S. 1023 (1987).

[79]*See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

[80]*See Hudson*, 547 U.S. at 593; *United States v. Ramirez*, 523 U.S. 65, 72, n.3 (1998); *Rawlings*, 448 U.S. at 106-110; *Riesselman*, 646 F.3d at 1080-81; *United States v. Faulkner*, 636 F.3d 1009, 1015-17 (8th Cir.), *cert. denied*, 132 S.Ct. 761 (2011); *see also Wong Sun*, 371 U.S. at 491 (statement given several days after defendant had been released from custody was untainted by prior unlawful arrest); *United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991) ("[W]here a law enforcement officer merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search, the causal connection is sufficiently attenuated so as to purge the later investigation of any taint from the original illegality."); *United States v. Patino*, 862 F.2d 128, 132-34 (7th Cir. 1988) (confession six days after search was not a fruit thereof), *cert. denied*, 490 U.S. 1069 (1989).

## CONCLUSION

Officer Spargur's warrantless entry into the OC Store on July 28 was improper. So too were the observations he made while in the store. What he saw and did, and gleaned therefrom, could not be used as a basis for a warrant to search the store and confiscate items from it later that day. But Officer La Mons could reasonably rely on what Raelynn, Brouse, and Vicki said and did to conclude that he was authorized to enter and search the store on August 6 and seize articles located within. Suppression is justified for whatever evidence was discovered during and as a result of the July 28 entry, search and seizure; but not the evidence found in the Chevy Blazer – because there is no standing to challenge the search of it – nor the evidence spotted in and taken from the store nine days after-the-fact; and certainly not Long's incriminating statements to Officer La Mons and Agent Yellow. In the end, Long is entitled to some relief, just not all that he wanted or thought he was deserving of.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Long's Motion to Suppress Evidence and Statements, as supplemented,[81] be granted in part and denied in part for the reasons, and based on the authorities, stated herein.

---

[81]*See* Dkt. Nos. 28-29, 69.

## NOTICE

An aggrieved party must file written objections, within 14 calendar days, to challenge this Report and Recommendation before the assigned United States District Judge.[82]

Dated this **3rd** day of February, 2014, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

---

[82]*See* 28 U.S.C. §636(b)(1).