

**FILED**

**JUN 06 2014**

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR 13-30028-RAL |
| | * | |
| Plaintiff, | * | |
| | * | OPINION AND ORDER |
| vs. | * | ADOPTING IN PART REPORT |
| | * | AND RECOMMENDATION |
| JASON LONG, | * | AND DENYING MOTION TO |
| | * | SUPPRESS |
| Defendant. | * | |

## I.   INTRODUCTION

Defendant Jason Long ("Long") originally was indicted for one count of possession with intent to distribute a controlled substance, AM 2201, in violation of 21 U.S.C. § 841(a)(1). Doc. 1. A Superseding Indictment added two counts of possessing with the intent to distribute a controlled substance analog, a substance called XLR-11, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count III also alleges aiding and abetting under 18 U.S.C. § 2. Doc. 50.

Long filed a Motion to Suppress Evidence and Statements, Doc. 28. Magistrate Judge Mark A. Moreno held an evidentiary hearing on the Motion to Suppress on December 5 and 6, 2013. Doc. 60. At the suppression hearing, the parties raised additional arguments. Tr. 270.[1] Judge Moreno directed the parties to submit further briefing on the newly raised arguments and held another evidentiary hearing on January 9, 2014. Tr. 270, 274-76. In his Report and Recommendation Concerning Motion to Suppress Evidence and Statements ("Report and Recommendation"), Doc. 74, Judge Moreno recommended that the Motion to Suppress be granted in part and denied in part. Doc. 74 at 1. Both parties objected. Docs. 89, 90.

---

[1] Any references to the suppression hearing transcript will be "Tr." followed by the page number or numbers.

This Court reviews a report and recommendation under 28 U.S.C. § 636(b)(1), which provides in pertinent part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." This Court has conducted a de novo review of the record and proposed findings, adopts in part Judge Moreno's Report and Recommendation, sustains the Government's Objection to the Report and Recommendation, overrules Long's Objections to the Report and Recommendation, and denies Long's Motion to Suppress.

## II.     FACTS

### A. Officer Spargur's Entry into the OC Store

Officer Shane Spargur is a police officer with the Bureau of Indian Affairs ("BIA") for the Lower Brule Agency. Tr. 83. Officer Spargur was patrolling the Lower Brule Sioux Reservation ("the Reservation") in the pre-dawn hours of Saturday, July 28, 2012, when he spotted three young people around 4:20 a.m. Tr. 90-91. The Lower Brule Sioux Tribe ("Tribe") has an 11:00 p.m. curfew during the summer for juveniles. Tr. 91. Officer Spargur believed these individuals to be under eighteen, so he made contact with them to discuss their being out past curfew. Tr. 91. Two of the individuals had fireworks. Tr. 91, 195. The Tribe permits fireworks to be shot off only on the dates immediately surrounding the Fourth of July holiday. Tr. 91-92. Because shooting off fireworks after July 5 is not permitted on the Reservation, Officer Spargur confiscated the fireworks and asked the group where they got their fireworks. Tr. 91-92. One told Officer Spargur that "he just bought them down at the OC Store."[2] Tr. 92,

---

[2] Defense Counsel refers to the OC Store as "OC Novelties." See e.g., Tr. 196. This Opinion and Order will refer to the establishment as Officer Spargur did, which was the "OC Store."

196.

The OC Store was two blocks from where Officer Spargur contacted the juveniles, so he went to the store to speak with its proprietor, Jason Long, about selling fireworks out of season. Tr. 92-93. Officer Spargur had never been to the OC Store before July 28, 2012, but knew Long from a previous interaction at Long's house on the Reservation. Tr. 93-94, 101, 239. Long's house where Officer Spargur previously had contacted Long was a separate residence from the building that housed the OC Store. Tr. 94, 101, 239.

The OC Store was in a commercial building that appears to be paneled with corrugated aluminum siding. See Ex. 1.[3] A sign that says "Sioux Boys" sat on the roof above the entrance and, because of this sign, some people in the community sometimes referred to the store as the "old Sioux Boys" store. Ex. 1; Tr. 64, 95. The OC Store's main door was located on the side of the building adjacent to an area where the gas pumps were located. Ex. 1. A screen door was attached to the main door's exterior frame. Ex. 1. These doors—the main outside door and its screen door—did not open directly into the OC Store, but opened into a small rectangular area that serves as the store's entryway. Tr. 98. A metal door with a glass panel divided the entryway from the store. Ex. 5; Tr. 97. Thus, to get into the store from the parking lot, customers passed through three doors: the screen door, the main door that leads into the entryway, and the metal door with the glass panel that leads from the entryway into the store. Tr. 97-98.

Officer Spargur arrived at the OC Store around 4:30 a.m. Tr. 195. The OC Store did not

---

[3] Any references to exhibits entered into evidence at the suppression hearing will be "Ex." followed by the exhibit number.

have posted hours and Officer Spargur did not see an open sign or a closed sign.[4] Tr. 200, 206. From the parking lot, Officer Spargur could hear music coming from the store. Tr. 200. The store was not fully lit. One light near the street about twenty-five feet from the main door and one flood light attached to the building provided some exterior lighting. Tr. 196-200. The store's other floodlights, the lights attached to the gas pumps, and the light in the entryway were off. Tr. 196-201.

Both the screen door and the main door were unlocked, so Officer Spargur opened them and stepped into the OC Store's entryway. Tr. 97-98, 200-01. The metal door separating the entryway from the store was closed, but Officer Spargur could look through the door's glass panel into the store. Tr. 97-101, 202. Officer Spargur testified that the store was not fully lit, that most of the lights were off, but that it was lit well enough to permit him to "see from the door to the back areas with the merchandise stands." Tr. 101, 202-03, 206. He had not been to the store before so he was unsure whether this lighting was consistent with it being open or closed. Tr. 203. Officer Spargur did not have a warrant to enter the business. Tr. 104.

The OC Store was somewhat of a convenience store with rows of merchandise and a counter. Exs. 6, 8. The store had DVDs to rent, stand-up arcade games to play, and products for sale that include coffee, tobacco products, sunglasses, board games, and soft drinks. Ex. 6. Part of the back portion of the store was cordoned off by a blanket or a sheet. Ex. 6; Tr. 203. Officer Spargur testified that most of the light was coming from the back of the store near the blanket. Tr. 202-03, 206.

---

[4] The OC Store had a non-functioning electric open-closed sign. Tr. 305. The sign was not near the main door and was plugged into an outlet in an area of the building where the electricity was not hooked up. Tr. 296-97, 305-06.

4

Officer Spargur was "unsure of whether or not the store was open or closed," Tr. 207, but ultimately believed the store was open when he arrived because of the lighting, the music, and the doors being unlocked. Tr. 101-03. Also, one of the juveniles had told him that the group "just bought" fireworks from the OC Store. Tr. 92, 196. Because he was unsure whether the store was open, Officer Spargur decided to knock on the metal door and announce his presence before entering. Tr. 207-08. He knocked and announced twice, but received no response. Tr. 102, 209. Officer Spargur then opened the metal door, stood in the doorway, and called for Long while identifying himself. Tr. 102, 209-10. Officer Spargur saw Long's young son, Jason Long, Jr., within the store. Tr. 103, 209-10. The two had little, if any, interaction; Officer Spargur did not know whether Jason Long, Jr. even looked at him, and the boy did not speak with Officer Spargur or invite him to enter. Tr. 103-04, 208. Officer Spargur entered the OC Store and walked toward the back to talk with whomever was inside. Tr. 209-10.

Officer Spargur went to the rear of the OC Store where it had a concession or dining area with rows of booths similar to a small fast food restaurant's dining area. Tr. 104, 212, 243. In the dining area, there was one man sitting at a table and another person asleep on a different table. Tr. 104-05. The person who was awake identified himself as Freedom Long when Officer Spargur asked his identity. Tr. 104. Officer Spargur asked Freedom about the juveniles. Tr. 104-05. Freedom confirmed that the juveniles had been in the store, but said that he did not sell them fireworks. Tr. 105. Officer Spargur then asked to speak with Jason Long. Tr. 105. Freedom responded that Long was sleeping in his room. Tr. 105-06. Officer Spargur asked Freedom if he would go into Long's room, wake him, and bring him out. Tr. 106. Freedom went to Long's room and left Officer Spargur in the dining area. Tr. 107.

5

Once Freedom was gone, Officer Spargur noticed a small red and black resealable pouch on one of the tables in the dining area. Tr. 107-08. Officer Spargur recognized this pouch as one that would normally hold synthetic marijuana. Tr. 107, 217-18. Officer Spargur had received training at two different law enforcement positions on how to identify synthetic marijuana. Tr. 84-89, 108. Possessing synthetic drugs is illegal on the Reservation. Tr. 33. Officer Spargur did not seize the pouch. Tr. 109.

Freedom returned alone from Long's room saying that Long was sleeping. Tr. 109-10. Officer Spargur asked Freedom a second time to awaken Long; Freedom complied, left for Long's room, and then returned with Long. Tr. 110, 214-15. Officer Spargur told Long that he was there to ask him questions about fireworks and that no fireworks could be sold after the 5th of July. Tr. 110-11. Long acknowledged knowing that fireworks could not be sold after the 5th of July, and then Freedom interjected that the OC Store did not sell the juveniles fireworks. Tr. 110-11. Officer Spargur noticed that Freedom had slurred speech and slow movement which led Officer Spargur to suspect that Freedom was under the influence of something. Tr. 111. Officer Spargur then apologized for waking Long up and left. Tr. 111.

## B. Application for Warrant and Affidavit Submission to Judge Miner

From the store's parking lot, Officer Spargur contacted his Chief of Police, Joel Chino, to advise him that he had seen what he believed to be synthetic marijuana at the OC Store. Tr. 112-13. Chief of Police Chino asked Officer Spargur if possibly he was mistaken and whether he had observed legal shisha tobacco used for smoking in a hookah rather than illegal synthetic marijuana. Tr. 112-13, 221. Officer Spargur researched on the internet shisha tobacco packaging. Tr. 113. His research revealed that shisha tobacco typically was wrapped in foil and

6

packaged in cardboard, which was different from the package he observed at the OC Store. Tr. 113-14. His research supported his initial belief that the pouch observed in the OC Store was synthetic marijuana. Tr. 114.

After speaking with his supervisors, Officer Spargur drafted an application and affidavit for a search warrant for the OC Store. Tr. 114; Exs. 10, 11. Officer Spargur then called Judge Lorie Miner, the acting Chief Judge for the Lower Brule Sioux Tribe, to request a warrant. Tr. 32, 36, 116. At around 8:00 a.m. on Saturday, July 28, 2012, Judge Miner, who was at her home some distance from Lower Brule, approved the warrant telephonically to authorize the search of the OC Store. Tr. 36, 39, 122, 227-29.

Judge Miner was familiar with Long. She had dealt with Long on juvenile and custody matters and testified that she had no ill will against Long. Tr. 35-36. She also knew about Long and the OC Store. The tribal court is involved with both the counseling services and the probation office. Tr. 45. Around the latter part of 2010 and early part of 2011, Judge Miner began hearing from the Tribe's counseling services and the Tribe's probation officers about "this spice" Long was selling. Tr. 45.

Judge Miner also was involved in the process of adopting the tribal law banning synthetic drugs on the Reservation as a member of the Tribe's Judicial Committee ("the Committee"). Tr. 54. The Committee consists of a tribal council member, the Tribe's counseling services director, the community health director, an Indian Health Services' nurse, the BIA superintendent, the tribal attorney, and Judge Miner. Tr. 54. One function of the Committee is to recommend to the Tribal Council changes or additions to tribal laws. Tr. 54, 62. Before the resolution banning synthetic drugs was passed, members of the public and even a member of the Committee were

7

complaining that the tribal court was not doing anything to address synthetic drugs on the Reservation. Tr. 54. In July of 2011, the tribal attorney drafted proposed legislation seeking to ban synthetic drugs. Tr. 54-55. That proposed legislation came before the Committee, the Committee made changes, and the Committee forwarded the proposed legislation to the Tribal Council for its consideration. Tr. 54-55. Judge Miner was a participant in this process as a member of the Committee. Tr. 54-57.

After the Tribal Council outlawed synthetic marijuana, Judge Miner altered the conditions of release that she placed on pre-trial defendants by prohibiting defendants from entering businesses that possessed or sold synthetic drugs. Tr. 32-35, 43-45. This condition sometimes caused defendants to ask whether they could still go into the OC Store. Tr. 34-35. These questions prompted Judge Miner to change the condition to read: "Defendant shall not enter OC Novelties or any other business where synthetic marijuana or synthetic stimulants are sold, for sale or possessed." Tr. 34-35; Def. Ex. A. Although Long at that point had not been prosecuted for selling or possessing synthetic marijuana, Judge Miner based this condition on what she had heard from her colleagues and people in the community about Long selling synthetic marijuana. Tr. 45-47. Despite this background, Judge Miner testified that her decision to authorize the search warrant in this case was based solely on the evidence that was presented to her by Officer Spargur on the phone that morning. Tr. 52.

Judge Miner did not follow many of the typical procedural safeguards in issuing this warrant. This was only the second telephonic warrant that Judge Miner had authorized, Tr. 38, and it was just the second time that Officer Spargur had ever sought a telephonic warrant, Tr. 227. The conversation between Judge Miner and Officer Spargur was not recorded. Tr. 40-41,

227. Judge Miner believed that the police department recorded telephonic requests for search warrants, Tr. 63, but Officer Spargur "was not aware of anything that requires us to record conversations[,]" Tr. 227. Chapter 3 of Section 29 of the Lower Brule Sioux Tribal Code concerns search warrants, but it does not provide requirements regarding the issuance of telephonic search warrants. See Ex. 19.[5]

Judge Miner was not given, nor did she ask for, copies of Officer Spargur's application, his affidavit, or the search warrant. Tr. 40. Because Judge Miner never reviewed the affidavit and because her conversation with Officer Spargur was unrecorded, much of the testimony at the suppression hearing centered on establishing what Officer Spargur told Judge Miner over the telephone. Officer Spargur read to Judge Miner the portion of the application describing the property to be searched:

> [t]he premises, residence, and surrounding curtilage outside of the OC Store as well as all vehicles and outlying buildings located on the premises of the OC Store, a tan colored building with brown colored roof, located at 119 Sicangu

---

[5] Chapter 3 of Section 29 of the Tribe's criminal code states

> The warrant shall issue only on an affidavit . . . sworn to before the Lower Brule Sioux Tribal Court or Clerk of Court and establishing the grounds for issuing the warrant. If the judge is satisfied that the grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and names or describing the person or place to be searched. . . . Before ruling on a request for a warrant, the judge may require the person making the affidavit to appear personally and may examine, under oath, the witness or witnesses he may produce, provided that such proceeding shall be recorded on recording equipment, and made part of the affidavit.

Ex. 19.

> Drive north of intersecting road named BIA 10
> Rd. Registered in the name of Jason Long on the
> lower Brule Sioux Tribe Reservation, Lower
> Brule South Dakota.

Ex. 10 (unhighlighted portion on the top, left hand portion of the page); Tr. 117-18, 223-24

(noting that he read the part in the top, left-hand corner with the small font). Officer Spargur

largely omitted reading the remainder of his application.[6] Ex. 10.

Officer Spargur recalled reading much of his affidavit to Judge Miner. Ex. 11. Officer

Spargur testified he read to Judge Miner the portion of his affidavit describing his entry into the

OC Store, including that a group of juveniles at 4:30 a.m. told him they bought fireworks at the

OC Store and that Officer Spargur then went to contact Jason Long at the OC Store to speak with

him about selling fireworks. Ex. 11 at 2. Officer Spargur also read the portion of his affidavit

describing his entry and activity at the OC Store as follows:

> 5.  I entered the OC Store premises through the first door into
>     the entry way. I knocked and announced to make known my
>     presence and identity. I could hear loud music coming from
>     inside the store. With no answer to my knock I opened the
>     unlocked door to the store. I stood in the doorway and called
>     out "Jason" looking for Jason Long. I called out for Jason a
>     second time. On the second announcement, a juvenile stuck
>     his head out of the back concession area and looked towards
>     the entry. I made my way back to the concession area; again
>     calling out for Jason with no answer.
>
> 6.  After arriving at the concession area of the OC Store there
>     was an adult male who identified himself as Freedom Long.
>     I asked where Jason was. Freedom answered that Jason was
>     sleeping. There was a person sleeping on a table in the
>     concession area. I approached this person tapping their foot
>     and asking for Jason again. Freedom advised me to the fact

---

[6] Judge Moreno had Officer Spargur highlight the portions of those documents that he did
not read to Judge Miner. Tr. 120-21.

10

> that person was not Jason but in fact Joel Brouse Jr. I asked
> Freedom where Jason was sleeping. Freedom said that Jason
> was in his room. Freedom motioned to a room towards the
> back of the concession area. This room had a white door
> with a latch and padlock attached to the door frame. I started
> to make my way towards the door telling Freedom that I
> needed to speak with Jason about the possible sale of
> fireworks to [the juvenile] and the other individuals I had
> just been in contact with. I asked Freedom if [the juvenile]
> had been in there. Freedom stated that yes "[the juvenile]
> just left. But I didn't sell him any fireworks. He must have
> stole them."

7.    As I was standing near the door to Jason's room I noticed in
plain view on a table in the concession area a small black
and red package. This package was plastic re-sealable pouch
approximately 3 inches by 3 inches in size. I immediately
recognized this to be a package used by commercial
companies to sell botanical potpourris. From my previous
training and experience I know that people ingest these
potpourris by smoking them to achieve an intoxication
similar to marijuana. These substances have been classified
as synthetic drugs by the state of South Dakota and the
Lower Brule Sioux Tribe.

Ex. 11 at 3-4.

The affidavit that Officer Spargur read to Judge Miner next stated that Freedom was

"under the influence of something that was altering his state of mind and effecting his actions"

and that Officer Spargur "had to ask Freedom multiple times to go into Jason's room and wake

him." Ex. 11. The affidavit states that when Jason came out of his room, Officer Spargur told

him not to sell fireworks, Jason said he knew that he could not do so, and Officer Spargur left.

Ex 11.

Judge Miner testified that she would have had the officer read her the search warrant.

Tr. 64-65. Officer Spargur testified that he did not recall whether he read Judge Miner the search

11

warrant. Ex. 12; Tr. 122; Ex. 12. Officer Spargur's application requested the ability to search the property described in "Attachment A." Ex 11. Attachment A describes the area around the OC Store and states "[a]ll vehicles owned, used and/or associated with and by JASON LONG. A green colored Cadillac with white writing saying 'Rez Inc Lower Brule, SD.'" Ex. 12 at 2.[7]

## C. July 28 Search and Interview

After Judge Miner telephonically approved the search warrant, Officer Spargur and other officers began searching the OC Store around 9:00 a.m. on Saturday, July 28, 2012. Tr. 122. The officers seized over twenty packages of unopened incense from the store. Ex. 12 at 6. Parked outside the OC Store were two vehicles. Ex. 3. One was Long's green-colored Cadillac with white writing that said "Rez Ink." Ex. 3. The other was a dark 1997 Chevrolet Trailblazer, from which the team seized an empty package of incense. Exs. 3, 13; Tr. 122-23. Officer Spargur ran a license plate inquiry for the Trailblazer that revealed that it was registered to Freedom and Nancy Big Eagle, not to Long. Tr. 123; Ex. 19. This inquiry is time stamped at "14:50.06," or 2:50 p.m., on July 28, 2012, which was after the search warrant was executed. Ex. 13. Long, Freedom, and Wanda Fields were arrested. Tr. 236.

Officer Spargur interviewed Long at the police department after his arrest. Tr. 236. Officer Spargur read Long his rights from Miranda v. Arizona, 384 U.S. 436 (1966), before the interview began. Tr. 127, 236. Long initialed the advice of rights form, waived those rights, and spoke with Officer Spargur. Tr. 127, 236; Ex. 14.

---

[7] The search warrant describes a slightly different scope for the warrant than the affidavit. The warrant is for "[t]he premises, residence, and surrounding curtilage outside of the OC Store as well as all vehicles and outlying buildings . . . ." Ex. 12 at 1.

### D. August 6 Search and Interview

Vicki Her Many Horses ("Vicki"), who is Long's aunt, owned the Sioux Boys building out of which Long was running the OC Store. Tr. 282-83. Neither Vicki nor Long testified at the hearing.[8] When interviewed, Long stated that he had no written lease with Vicki. See Ex. 17; Tr. 139, 152. Vicki's daughter, Rae Lynn Her Many Horses ("Rae Lynn"), testified that Long was running his business out of the Sioux Boys building, but she was not certain Long had a lease agreement with Vicki. Tr. 282-83, 301.

After Long was arrested on July 28, 2012, Vicki called Rae Lynn and told her that she no longer could take care of the building and was willing to sell it to Rae Lynn. Tr. 283. On August 4, 2012, Vicki, Rae Lynn, and Rae Lynn's longtime boyfriend, Jacob Brouse ("Brouse"), executed a Bill of Sale, Ex. 19, in which Vicki sold the building to Brouse with Rae Lynn to be the manager. Tr. 289-90.[9] At that point, Long apparently was no longer a tenant of the building. See Tr. 139 (stating that Long told police officers that Vicki had "trespassed" him from the store), Tr. 150 (stating that Vicki told police officers that Long was not permitted to be at the building); cf. Tr. 292 (stating that Vicki never told Rae Lynn that Long was not supposed to be there).

During the morning of August 6, 2012, a break-in occurred at the Sioux Boys building.

---

[8] Long could have testified at the suppression hearing without fear that his testimony would be used against him at trial. Simmons v. United States, 390 U.S. 377, 394 (1968) ("We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.").

[9] Although the original purchase price was $1.00, Rae Lynn and Brouse ultimately paid either $3,500.00 or $3,700.00 for the building. Tr. 294-95.

13

Tr. 286. After the police came and left, Rae Lynn and Brouse shut the door, which they could not lock because the door had been broken during the break-in, and left for Chamberlain, South Dakota, to buy a new lock and wires to fix the security system. Tr. 288-89. When the couple returned from Chamberlain, the door they had closed was open yet again. Tr. 289. The couple walked into the store, found items that were not there earlier, and called the police. Tr. 290.

Officer Jason La Mons responded to the call. Tr. 163-64. Upon his arrival, Officer La Mons met Rae Lynn and Brouse, who both gave Officer La Mons consent to search the building. Tr. 137-38, 151-52, 290, 302. Once inside, the group found a $100 bill and a FedEx box that had not been in the building when the couple left for Chamberlain. Tr. 164-67. Officer La Mons also found a witness statement bearing Long's name that Officer La Mons recognized because he personally had given the witness statement to Long a few days earlier. Tr. 139-40, 167. Brouse picked up the FedEx box to show Officer La Mons and Officer La Mons saw invoices inside it. Tr. 165. Rae Lynn and Brouse told Officer La Mons that Long had come around earlier looking for a FedEx box, implying that the FedEx box belonged to Long. Tr. 167-68. Officer La Mons testified that he collected items for evidence from the suspected burglary or trespassing, Tr. 140-41, including the witness statement and the FedEx box. See Tr. 166-70; Doc. 89 at 7.

Later on August 6, 2012, Officer La Mons went to Long's house to speak with him about the alleged burglary. Tr. 168-69. Officer La Mons told Long to come out of his house and said that he "needed" to speak with him. Tr. 169. Officer La Mons questioned Long about the witness statement he had given Long. Tr. 143, 170. Long said it was in his house. Tr. 143, 170. Officer La Mons then produced the witness statement that he had collected from the OC Store.

14

Tr. 143, 170. Long admitted going into the OC Store earlier that morning to check on his inventory, having heard of a prior break-in. Tr. 143-44. Officer La Mons then arrested Long for trespass. See Tr. 143-44, 150-51, 169-71.

Officer La Mons did not read Long his Miranda rights when he arrested him nor did he question Long after the arrest. Tr. 45, 171. Long, however, talked extemporaneously. Tr. 144-45, 171-72. Only upon arriving at the jail did Officer La Mons read to Long his Miranda rights. Tr. 145, 147, 172-73; Ex. 15. Long said that he understood those rights and asked Officer La Mons what happened to his $100 bill. Tr. 188. Long continued talking while Officer La Mons booked him into jail, asking only standard booking questions. Tr. 188-89.

After his booking, Agent Michael Yellow, a special agent with the BIA assigned to the FBI Drug Task Force in Pierre, South Dakota, interviewed Long regarding the alleged synthetic marijuana seized during the July 28, 2012 search. Tr. 25-53, 261-62. The interview lasted about one hour and six minutes and was recorded. Ex. 17. Agent Yellow read Long his Miranda rights. Ex. 17. Long indicated he understood them, signed a Waiver of Rights form, and agreed to speak with Agent Yellow. Exs. 16, 17.

Around fifty-five minutes into the interview, Long became emotional and expressed interest in terminating the interview. Ex. 17; Tr. 257. The following exchange occurred:

| LONG: | Can I just go back, man? |
|---|---|
| AGENT YELLOW: | What's that? |
| LONG: | Can I go back? |
| AGENT YELLOW: | You want to be done? You can be done. |
| LONG: | I just . . . I don't know . . . what you guys want from me. You want my head? |
| AGENT YELLOW: | I don't. |
| LONG: | You want my life? |
| AGENT YELLOW: | I don't want that either. |

15

| LONG: | You know then that's the way I feel. |
|---|---|
| AGENT YELLOW: | Alright. Let me tell the guy then. To have somebody come get you. |
| LONG: | Will I be able to make phone calls then? |
| AGENT YELLOW: | That will be up to the jail site. |

Ex. 17. Agent Yellow stepped outside the room, told the dispatch officer that "he's all done,"

and asked dispatch to summon a corrections officer. Tr. 258; Ex. 17. When Agent Yellow

reentered the room, the following exchange occurred:

| AGENT YELLOW: | Alright, you done talking then? |
|---|---|
| LONG: | Uhm. Is there anything else you want to know? |

Ex. 17. Long then continued talking without Agent Yellow prompting his monologue. Agent

Yellow thereafter continued the interrogation, and Long made additional incriminating

statements. About seven minutes later, at around the one hour and one minute mark, the

corrections officer that Agent Yellow previously summoned arrived and the following exchange

occurred:

| AGENT YELLOW: | Alright, so did you want to be done because I don't want to . . . you know . . . keep you here any longer than . . . |
|---|---|
| LONG: | If you want to know anything . . . I told you . . . |
| AGENT YELLOW: | You're the one that said you wanted to go back. That's why I had this Gentleman come over. So if you want to go back . . . |

Ex. 17; Tr. 258-59. Long then continued to speak for another five minutes until Officer Yellow

terminated the interview because Long was repeating the same information. Tr. 259.

16

## III.    DISCUSSION

### A.   July 28, 2012 Entry

#### 1. Fourth Amendment Search

Long argued alternative theories as to why Officer Spargur's warrantless entry into the

OC Store at 4:30 a.m. on the morning of July 28, 2012, constituted an unconstitutional search.

Doc. 29 at 5.  Long argued that Officer Spargur violated his reasonable expectation of privacy

in the OC Store because (1) the OC Store was his home and Officer Spargur entered it without

a warrant; or, alternatively, (2) the OC Store was his business that was closed at the time of the

warrantless entry.  Doc. 29; Doc. 89.  Judge Moreno did not address the first issue because he

concluded that the store was closed and therefore Officer Spargur's warrantless entry would be

unconstitutional.  Doc. 74 at 10.  Judge Moreno also found inapplicable the good-faith exception

from United States v. Leon, 468 U.S. 897 (1984). The Government objects to Magistrate Judge

Moreno's conclusions that the business was closed and that the good-faith exception did not

apply.  Doc. 90 at 6.

Long bears the burden of establishing whether Officer Spargur's warrantless entry

constitutes an unreasonable Fourth Amendment search.  United States v. James, 534 F.3d 868,

872 (8th Cir. 2008).  Because the defendant "bears the burden of proving a Fourth Amendment

violation[,]" it is he "who shoulders the consequences of an insufficiently developed record."

United States v. Esquivel-Rios, 725 F.3d 1231, 1239 (10th Cir. 2013).  Long must carry his

burden by a preponderance of the evidence.  See United States v. Matlock, 415 U.S. 164, 177

n.14 (1974); United States v. Dembry, 535 F.3d 798, 801 (8th Cir. 2008).

The Fourth Amendment provides that "[t]he right of the people to be secure in their

17

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV. "[A] 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred" if "the Government obtains information by physically intruding on persons, houses, papers, or effects[.]" Florida v. Jardines, 133 S. Ct 1409, 1414 (2013) (internal quotation marks omitted). A government intrusion into an area also constitutes a "search" if the intrusion "violates a subjective expectation of privacy that society recognizes as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001); see also United States v. Mathias, 721 F.3d 952, 957 (8th Cir. 2013) ("The question of whether a person has a constitutionally protected reasonable expectation of privacy in an area requires us to ask (1) whether the individual manifested a subjective expectation of privacy in the area; and (2) whether society is willing to recognize the expectation as reasonable.").

### a. OC Store was not a house

While the warrantless entry into any portion of a private house at any time is presumptively unreasonable, Marshall v. Barlow's Inc., 436 U.S. 307, 312 (1978), a warrantless entry into a business is unreasonable only if the business is closed or the search extended into non-public areas. See New York v. Burger, 482 U.S. 691, 699 (1987); See v. City of Seattle, 387 U.S. 541, 545 (1967). Long's first argument in favor of suppression is that the OC Store was his house, not his business.

The OC Store was not Long's home; it was a business. The OC Store was well-known in the community as a business. It sat in a corrugated commercial building with gas pumps, a business sign, and even a company car parked near the door. The OC Store had a counter, coffee machines, rows of merchandise, DVDs for rent, and standing arcade games. Long did not own

18

the building, but was a tenant operating a commercial business there. The OC Store lacked the attributes of a home. Further, Officer Spargur believed that the OC Store was not Long's house because he had previous contact with Long at his house, which is a separate structure on the Reservation.

Further, even if Long had a subjective belief that the OC Store had become his home, that subjective belief was objectively unreasonable. "The factors applied to examine if a subjective expectation is objectively reasonable relate to both property interests, and whether the individual claiming the right took measures to protect those interests." United States v. Mendoza, 281 F.3d 712, 715 (8th Cir. 2002). In Mendoza, the defendant claimed a legitimate expectation of privacy in the common areas of his multi-family dwelling. Id. at 715-16. Tenants of multi-family dwellings typically lack legitimate expectations of privacy in such areas. Id. at 715. The Eighth Circuit held that any expectation of privacy was unreasonable because the defendant "did nothing that would lead the officers to believe he had a protectable interest in the common area[,]" an area in which he typically would lack a legitimate expectation of privacy. Id. at 715-16.

Long appears to have had an unwritten lease to operate a commercial business out of the Sioux Boys building, not to make it his residence. The OC Store lacked indicia common to homes entered by Officer Spargur, and Long took no action to indicate that the OC Store had ceased being a business and had become a residence. Although Long was sleeping in one of the OC Store's locked back rooms, he "did nothing that would lead the officers to believe that he had a protectable interest" in the OC Store as his home. See id.; cf. United States v. Werra, 638 F.3d 326, 336 (1st Cir. 2011) (holding that resident of an atypical residence presented evidence showing that he had an expectation of privacy in the entire house). Long failed to show that OC

19

Store was anything other than a store and therefore it is not entitled to the greater protections afforded by the Fourth Amendment to residences. Burger, 482 U.S. at 699.

Even if Long had a legitimate expectation of privacy in any area of the OC Store as his residence, it was limited to the room where he was sleeping and does not extend to the store's public portions. See United States v. Cannon, 703 F.3d 407, 412-13 (8th Cir. 2013) (assuming that an employee of a business has subjective expectation of privacy in specific rooms within an open business that the employee was using as his residence); United States v. Anderson, 154 F.3d 1225, 1229 (10th Cir. 1998) (holding that employee had legitimate expectation of privacy in a room within a business in which the employee locked himself inside and closed the blinds and curtains). Officer Spargur did not violate that expectation of privacy because he never entered that room; he confined his entry to the area of the store typically open to the public, which at the time of entry was where Freedom was sitting and where another individual was sleeping, and viewed evidence giving rise to the probable cause determination in plain view. Long took no affirmative steps to exclude the public from the areas of the store that Officer Spargur entered and presented no evidence that he had taken steps that would lead someone to believe he had a protectable interest in these areas. See Mendoza, 281 F.3d at 715-16. A legitimate expectation of privacy in the single room in which he was sleeping does not render intrusions into a business's public portions unconstitutional.

### b. OC Store as a closed business

The Government objected to Judge Moreno's conclusion that Officer Spargur's warrantless entry was an unconstitutional search because the OC Store was closed. Doc. 74 at 10; Doc. 90. The Fourth Amendment's prohibition against unreasonable searches applies to

businesses, in addition to private homes. Burger, 482 U.S. at 699; see also See, 387 U.S. at 543

("The businessman, like the occupant of a residence, has a constitutional right to go about his

business free from unreasonable official entries upon his private commercial property."). A

person's expectation of privacy in his business, however, is "different from, and indeed less than,

a similar expectation in an individual's home." Burger, 482 U.S. at 700. Unlike the warrantless

entry of a home, which is presumptively unreasonable at any time, Marshall, 436 U.S. at 312,

a warrantless entry into a business is unreasonable only if the officer enters the business, or

certain portions therein, when the business is not "open to the public . . . ." See, 387 U.S. at 545;

see also Maryland v. Macon, 472 U.S. 463, 469 (1985) ("Here, respondent did not have any

reasonable expectation of privacy in areas of the store where the public was invited to enter and

to transact business.").

   The ultimate issue is whether the store was "open to the public" when Officer Spargur

entered. Whether a business is open often is established through testimony from a person with

knowledge that the business was open or closed at the time of entry. See O'Rourke v. Hayes,

378 F.3d 1201, 1204-07 (11th Cir. 2004) (noting that employee told police officers that the

business was closed before they entered); United States v. Morton, 17 F.3d 911, 913-14 (6th Cir.

1994) ("The officers' and defendant's testimony fairly establish that the auto shop was open to

the public for business."), overruled on other grounds by McNeill v. United States, 131 S. Ct

2218 (2011); United States v. Swart, 679 F.2d 698, 701 (7th Cir. 1982) ("[T]he officers knew

the business was closed. Commercial establishments do not extend an implicit invitation to enter

during non-business hours or when there are no employees on the premises."). Courts also

consider the circumstances surrounding the entry to determine whether a business was open at

the time of a government intrusion. See e.g., Swart, 679 F.2d at 701-02. These include whether the entry was during normal business hours; whether the store had posted business hours and whether the entry was within those hours; whether the store had open-closed signage; whether there were employees and customers present; and whether doors were open, closed, or locked. See Macon, 472 U.S. at 469; United States v. Watson, 244 F. App'x 484, 488 (3rd Cir. 2007); United States v. Ealy, 363 F.3d 292, 295 n.1 (4th Cir. 2004); United States v Tolar, 268 F.3d 530, 531-32 (7th Cir. 2001); United States v. Bute, 43 F.3d 531, 537 (10th Cir. 1994); Morton, 17 F.3d at 912-13; Swart, 679 F.2d at 701-02; United States v. Hernandez, 76 F. Supp. 2d 578, 579-80 (E.D. Pa. 1999).

Here, no one testified whether the OC Store was open or closed at the time Officer Spargur entered the store. The only testimony about the status of the OC Store at that time came from Officer Spargur, who himself was unsure if the store was open or closed, but ultimately believed it open.

In United States v. Ealy, 163 F. Supp. 2d 633 (W.D. Va. 2001), the court addressed the analogous case of whether an auto repair garage on the defendant's mother's property and near the house where the defendant lived was open when officers entered and observed incriminating evidence. Id. at 635-38. The garage did not keep regular hours, did not have posted hours, and did not display an open-closed sign. Id. at 635-36. Testimony established, however, that "[i]f the door was open and the lights were on," then the garage was open. Id. at 636-38. When the police arrived and entered, the door was open slightly and the lights within the garage were on. Id. The district court held that the business was open and entry was not an unlawful search. Id. at 638. The United States Court of Appeals for the Fourth Circuit upheld the district court,

22

observing that the officers "entered the garage in precisely the manner that potential customers entered." Ealy, 363 F.3d at 295 n.1.

Here, whether the OC Store was open or closed is a difficult factual question. Some circumstances support an inference that the business was open; the juveniles said that they had just made a purchase from the store, the doors were unlocked, music was playing inside, and the lighting was sufficient to see throughout the store. Other circumstances support an inference it was closed; the search was conducted at a time when many businesses are closed, the lighting was marginal, and Officer Spargur did not observe employees or customers from the outside. Ultimately, Long bears the burden to establish a constitutional violation, James, 534 F.3d at 872, yet he presented no evidence regarding the store's normal hours of operation or testimony that it was in fact closed. Long has failed to establish by a preponderance of the evidence that the OC Store was closed and thus that Long had a reasonable expectation of privacy in the OC Store at the time of the entry.

## 2. The Good-Faith Exception

Even if this Court were to conclude that the OC Store was closed at the time of Officer Spargur's entry, the good-faith exception announced in Leon, 468 U.S. 897, would apply to prevent application of the exclusionary rule to the evidence gathered pursuant to the subsequent warrant and search. The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." Id. at 906 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). "Ordinarily, '[e]vidence obtained in violation of the Fourth Amendment is subject to the exclusionary rule and, therefore, cannot be used in a criminal proceeding against

23

the victim of the illegal search and seizure.'" Cannon, 703 F.3d at 412 (quoting United States
v. Riesselman, 646 F.3d 1072, 1078 (8th Cir. 2011)) (internal quotation marks omitted).
Because the rule is a prophylactic remedy, instances exist where evidence gathered in
contravention of the Fourth Amendment will not be subject to exclusion. Id. The Supreme
Court recognized one of these instances in Leon in establishing a good-faith exception to the
exclusionary rule. 468 U.S. at 922. The Supreme Court explained the rationale behind the good-
faith exception in this manner:

> It is the magistrate's responsibility to determine
> whether the officer's allegations establish
> probable cause and, if so, to issue a warrant
> comporting in form with the requirements of the
> Fourth Amendment. In the ordinary case, an
> officer cannot be expected to question the
> magistrate's probable-cause determination or his
> judgment that the form of the warrant is
> technically sufficient. Once the warrant issues,
> there is literally nothing more the policeman can
> do in seeking to comply with the law. Penalizing
> the officer for the magistrate's error, rather than
> his own, cannot logically contribute to the
> deterrence of Fourth Amendment violations.

Id. at 921 (internal quotation and citation omitted).

The good-faith exception prevents suppression of evidence gained in an unconstitutional

manner if the police officers act "in 'good faith' reliance upon a judge's warrant." United States

v. Scroggins, 361 F.3d 1075, 1083 (8th Cir. 2004). An officer acts in "good faith" when his

actions are "objectively reasonable[,]" id., such that he "could have believed the search was

valid[,]" United States v. Fletcher, 91 F.3d 48, 51 (8th Cir. 1996) (citing Leon, 468 U.S. at 918).

The good-faith exception also may apply when, as here, the defendant argues that

24

evidence contained in the affidavit that gave rise to a probable cause determination was gathered in violation of the defendant's Fourth Amendment rights. Cannon, 703 F.3d at 413. In this situation, the good-faith exception applies if the officers' prewarrant conduct is "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." Id. (quoting United States v. Conner, 127 F.3d 663, 667 (8th Cir. 1997)). "If, on the other hand, the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply." Conner, 127 F.3d at 667 (quoting United States v. O'Neal, 17 F.3d 239, 242-43 n.6 (8th Cir. 1994)). If the case presents a "close question," the good-faith exception should be considered. Fletcher, 91 F.3d at 51.

In Fletcher, whether the officers' prewarrant conduct was constitutional was a "close question" of fact. 91 F.3d at 51-52 (internal marks omitted). At issue was whether the officers had reasonable suspicion to detain the defendant to conduct a drug dog sniff. Id. The drug dog sniff provided evidence that the officers used to obtain a search warrant. Id. at 50. Some facts supported the conclusion that the officers had reasonable suspicion, but upon review, the weight of the evidence established that the officers did not have reasonable suspicion. Id. at 51-52. But, because of the conflicting nature of the evidence, the Eighth Circuit held that the officers' conduct was "within the gray area of Leon." Id. at 51. The officers' decision to detain the defendant because of their belief in the existence of reasonable suspicion was "close enough to the line of validity" such that "the officers had an objectively reasonable belief" in the validity

25

of their actions and in the validity of the warrant. Id. at 51-52.

Like in Fletcher, the constitutionality of Officer Spargur's prewarrant conduct—entering

the store because he thought it might be open although he admittedly was unsure—is a close

factual question. Long presented no direct evidence that the OC Store was closed and the

circumstantial evidence as to whether the store was open is conflicting. Officer Spargur arrived

at the store approximately ten minutes after being told by a group that they had "just bought"

fireworks in the store. All three doors leading into the store were unlocked, he heard music, he

could see throughout the store, and he saw a person inside. Officer Spargur then provided an

accurate description of the circumstances surrounding his warrantless entry to Judge Miner who

listened, approved his application, and orally issued the search warrant. In light of the

conflicting evidence, Officer Spargur had a reasonable belief that the store was open, and his

decision to enter was "close enough to the line of validity to make [his] belief in the validity of

the warrant objectively reasonable." Cannon, 703 F.3d at 413 (quoting Conner, 127 F.3d at 667).

Therefore, the good-faith exception applies.

### B. Whether the Warrant is Procedurally Invalid Under the Fourth Amendment

Judge Moreno did not address whether the warrant issuing process employed by Judge

Miner violated the Fourth Amendment and, if it did, whether the good-faith exception applied

because he concluded that the search was unconstitutional for other reasons. Long asked this

Court to consider his additional arguments in favor of suppression should this Court not adopt

Judge Moreno's Recommendation. Doc. 89 at 2-3.

## 1. Tribal Law Violations Do Not Justify Exclusion

Long argues that the search warrant was issued in violation of the Fourth Amendment

because Judge Miner violated a number of provisions of the Rules of Criminal Procedure for the

Lower Brule Sioux Tribe. Doc. 69 at 1-4. "Federal, not tribal or state, law governs the

admissibility" of evidence in a federal prosecution. United States v. Hornbeck, 118 F.3d 615,

617-18 (8th Cir. 1997). Evidence will not be excluded in a federal prosecution based solely on

alleged violations of state or tribal law unless there is a corresponding Fourth Amendment

violation. Id. at 617 (rejecting argument that evidence was subject to exclusionary rule because

tribal law was violated); see also United States v. Cote, 569 F.3d 391, 393 (8th Cir. 2009)

("[E]vidence seized by state officers in conformity with the Fourth Amendment will not be

suppressed in a federal prosecution because *state* law was violated." (quoting United States v.

Bieri, 21 F.3d 811, 816 (8th Cir. 1994))); United States v. High Wolf, No. CR.

07-30102-01-KES, 2008 WL 3833587, at *5 (D.S.D. Aug. 11, 2008) (holding that even if tribal

law was violated, suppression was not required because "the tribal law violation did not affect

the constitutionality of the stop and search"). Long's argument that suppression is warranted

based solely on alleged tribal law violations is misplaced because tribal law violations, in and

of themselves, do not implicate the Constitution.

When a defendant's motion to suppress is predicated solely on tribal law violations

27

without pleading corresponding constitutional violations, a court may deny the motion without entertaining the un-plead, or poorly plead, constitutional violations. See Hornbeck, 118 F.3d at 617-18. In Hornbeck, the defendant argued that suppression was warranted because the warrant was void under tribal law. Id. at 617. The Eighth Circuit held that the defendant's position was "insufficient as a matter of law" for failing to allege a violation of the Constitution or of federal law. Id. at 618. The defendant's brief "mention[ed] the Fourth Amendment and the Constitution in passing, but [did] not explain how they were implicated by the alleged violations of tribal law." Id. Therefore, the Eighth Circuit declined to address whether the facts relating to the alleged tribal law violations would be cognizable as a Fourth Amendment violation. Id.

Long's arguments in favor of suppression here all are predicated on alleged tribal law violations. See Doc. 69; Doc. 89. Long's briefs mention the Fourth Amendment generally, but do not explain how the facts related to the alleged tribal law violations would constitute independent Fourth Amendment violations. See Doc. 69; Doc. 89. While this Court could refuse to consider possible Fourth Amendment implications, see Hornbeck, 118 F.3d at 617-18, this Court will consider those implications nevertheless.

## 2. Whether the Good-Faith Exception Applies

The Government asserts that Rule 41 of the Federal Rules of Criminal Procedure applies,[10] concedes that Judge Miner failed to comply with that Rule's recording requirements,

---

[10] Whether Rule 41 applies is not clear. "Rule 41 applies only where a warrant is sought by a federal law enforcement officer or where the search can otherwise be characterized as federal in

and asks this Court to address the issues under the good-faith exception from <u>Leon</u>, 468 U.S.

897. Doc. 70 at 7-8. Even when failures in the warrant process rise to a constitutional level, the

<u>Leon</u> good-faith exception may justify not suppressing the evidence. <u>See e.g.</u>, <u>United States v.</u>

<u>Hessman</u>, 369 F.3d 1016, 1019-23 (8th Cir. 2004); <u>United States v. Richardson</u>, 943 F.2d 547,

550-51 (5th Cir. 2001); <u>United States v. Valandra</u>, No. CR 11-30010-RAL, 2011 WL 3439919,

at *3 (D.S.D. Aug. 5, 2011). Further, the pivotal issue—whether Judge Miner abandoned her

judicial role or failed to act as a neutral and detached magistrate under the Fourth

Amendment—may be addressed in determining whether the good-faith exception applies.

<u>See United States v. Decker</u>, 956 F.2d 773, 777-78 (8th Cir. 1992) (holding that a Fourth

Amendment violation occurred because the magistrate abandoned his judicial role and refused

to apply the good-faith exception based on the court's previous conclusion that the issuing judge

had abandoned his judicial role).

     This Court discussed the good-faith exception's background and rational above. <u>See</u>

<u>supra</u> Section III.A.2. An officer acts in "good faith" when his actions are "objectively

---

character." <u>Cote</u>, 569 F.3d at 393 (quoting <u>United States v. Jones</u>, 471 F.3d 868, 871 (8th Cir. 2006)). This Court has held Rule 41 inapplicable when a tribal officer with authority to enforce both federal and tribal law applies for a search warrant on tribal forms for an alleged tribal law violation before a tribal judge. <u>See United States v. Medearis</u>, 775 F. Supp. 2d 1110, 1118-1120 (D.S.D. 2011) (holding that a tribal officer was not acting as a federal officer because the warrants he sought and executed were tribal and the warrants concerned tribal law violations that were issued by tribal judge); <u>see also United States v. Fredericks</u>, 273 F. Supp. 2d 1032, 1036-37 (D.N.D. 2003) (holding that Rule 41 did not apply when BIA officer sought tribal search warrant on a tribal form for a tribal code violation and sought assistance from tribal prosecutor). Whether Rule 41 applies and whether any alleged Rule 41 violation was constitutionally significant are not issues that were briefed or argued.

reasonable[,]" Scroggins, 361 F.3d at 1083, such that he "could have believed the search was valid[,]" Fletcher, 91 F.3d at 51 (citing Leon, 468 U.S. at 918). There are four instances that preclude a finding that the officer acted in objective good faith reliance on the affidavit: (1) when the issuing judge is misled by information that is false or made in reckless disregard for the truth; (2) when the issuing judge abandons her judicial role; (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in the existence of probable cause is entirely unreasonable; and (4) when the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid. Leon, 468 U.S. at 923; see also Cannon, 703 F.3d at 412. A court considers the totality of the circumstances when deciding whether the good-faith exception applies. United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).

Long initially argues that the good-faith exception does not apply at all because "there was never a warrant issued." Doc. 69 at 4 (arguing that the "warrant was never signed" and that the Tribe does not permit telephonic issuance of warrants, thus the warrant was not issued). He cites to United States v. Evans, 469 F. Supp. 2d 893 (Mont. 2007), for support. Doc. 69 at 4. Evans did not involve a telephonic search warrant, but a failure of a judge to sign a warrant when it was presented to him in person. 469 F. Supp. 2d at 900. The court in Evans held that the search was warrantless and the good-faith exception did not apply because reliance on an

unsigned warrant was not objectively reasonable. Id. at 897, 900. The court in Evans also noted

that "[i]ssuance serves to demonstrate that a neutral and detached magistrate has reviewed the

warrant application and affidavit and made an independent and objective determination that

probable cause exists to justify the search" and that "[t]he Fourth Amendment's issuance

requirement may not necessitate a magistrate's signature on the warrant." Id. at 897. While the

issuing judge in Evans did not manifest his approval for the search at all, here Judge Miner swore

Officer Spargur, listened to his affidavit, made a probable cause determination, and authorized

his search. Courts, including this one, albeit grudgingly, have applied the good-faith exception

when warrants are authorized telephonically, but without adhering to procedural safeguards. See

e.g., United States v. Cazares-Olivas, 515 F.3d 726, 728-30 (7th Cir. 2008); United States v.

Medearis, 775 F. Supp. 2d 1110, 1120-24 (D.S.D. 2011).

　　　　Long next contends that, under the first Leon exception, Officer Spargur's affidavit

contains false statements. Doc. 69 at 5; Doc. 29 at 8-9. Long's argument is an attack on the

affidavit under Franks v. Delaware, 438 U.S. 154 (1978). Doc. 29 at 8-9; Doc. 69 at 5. "A

defendant is entitled to an evidentiary hearing pursuant to Franks . . . if he 'makes a substantial

preliminary showing that a false statement knowingly and intentionally, or with reckless

disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly

false statement is necessary to the finding of probable cause.'" United States v. Chipps, 410 F.3d

438, 443 (8th Cir. 2005) (quoting Franks, 438 U.S. at 155-56). This substantial showing "is not

31

lightly met." United States v. Mathison, 157 F.3d 541, 548 (8th Cir. 1998) (quoting United

States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987)). "A mere allegation standing alone, without

an offer of proof in the form of a sworn affidavit of a witness or some other reliable

corroboration, is insufficient to make the difficult preliminary showing." Id.

Long alleges the following statement by Officer Spargur is false:

> [I noticed] in plain view on a table in the
> concession area a small black and red package.
> This package was plastic re-sealable pouch
> approximately 3 inches by 3 inches in size. I
> immediately recognized this to be a package used
> by commercial companies to sell botanical
> potpourris. From my previous training and
> experience I know that people ingest these
> potpourris by smoking them to achieve an
> intoxication similar to marijuana. These
> substances have been classified as synthetic drugs
> by . . . the Lower Brule Sioux Tribe.

Ex. 14; Doc. 29 at 8; Doc 69 at 5. At the hearing, Officer Spargur testified consistently with his

affidavit. Long made no offer of proof, filed no sworn affidavits, and presented no testimony

that any portion of Officer Spargur's statement was false. Instead, Long simply argues that

Officer Spargur could not have known that the botanical potpourris he observed in plain view

were controlled substance analogs. Doc. 29 at 9. Although that may be true, Officer Spargur

had training at two law enforcement postings about identifying botanical potpourris that

commonly are consumed to reach a high similar to that achieved when smoking marijuana and

had the requisite background to identify for probable cause purposes a package as a botanical

potpourri used for human consumption contrary to tribal law.

Long argues that the second <u>Leon</u> exception applies because Judge Miner abandoned her judicial role. "The purpose behind the warrant requirement of the Fourth Amendment is to interpose a neutral figure between the citizen and the police officer 'engaged in the often competitive enterprise of ferreting out crime.'" <u>United States v. Johnson</u>, 504 F. Supp. 2d 554, 564 (S.D. Iowa 2007) (quoting <u>Johnson v. United States</u>, 333 U.S. 10, 14 (1948)). Because search warrants are accompanied by "the detached scrutiny of a neutral magistrate," courts exhibit a "strong preference for warrants" and provide "great deference" to a judge's conclusion that a warrant shall issue. <u>Leon</u>, 468 U.S. at 913-14 (internal quotation marks and citation omitted). Deference to the judge, however, is not warranted when the issuing judge serves as "a rubber stamp for the police[,]" or fails to manifest that "neutrality and detachment demanded of a judicial officer . . . and who acts instead as an adjunct law enforcement officer[.]" <u>Id.</u> (internal quotation marks and citation omitted); <u>see also</u> <u>United States v. Heffington</u>, 952 F.2d 275, 278 (9th Cir. 1991) ("The Supreme Court has found an impermissible lack of neutrality in cases where the particular magistrate was also involved in law enforcement activities, had a pecuniary interest in the outcome of his decision, or had 'wholly abandoned' his judicial role.").

Long first contends that Judge Miner acted as a rubber stamp because she violated procedural safeguards in authorizing the search warrant by telephone without following certain protocols. <u>See</u> Doc. 69 at 2-10. This Court has considered the validity of a tribal search warrant

33

obtained by telephone in two previous cases. In both cases, this Court applied the good-faith exception. In Medearis, a tribal officer had obtained a valid search warrant from a tribal judge from the Rosebud Sioux Tribe to search a vehicle. 775 F. Supp. 2d at 1116, 1120. After conducting the search, the officer wanted to expand the scope of the warrant to include the area around the vehicle because a part of the vehicle material to the investigation had been removed. Id. at 1116. The tribal officer called the issuing judge, the judge did not place the officer under oath, the conversation was not recorded, the officer particularly described the additional place to be searched and the thing to be seized, and the tribal court judge authorized the further search. Id. at 1116-17, 1122. The majority of the facts supporting the further search were contained in the affidavit supporting the original search warrant. Id. at 1122. This Court held that the good-faith exception applied because, despite the procedural errors, the officer's "reliance on the warrant was in good faith" as he "reasonably believed that he had a valid telephonic warrant, or at least court-approved authority[.]" Id.

In Valandra, also involving the Rosebud Sioux Tribe, the officer sought a telephonic search warrant, but did not give to the judge a copy of the warrant and did not read the warrant over the telephone. 2011 WL 3439919, at *3. The judge recorded the conversation, but never actually signed a search warrant. Id. at *3-4. After placing the officer under oath, the judge determined probable cause and authorized the search orally. Id. at *4. At one point, the officer asked the judge about entertaining a broader search—a search for Valandra's urine—but the

judge refused, telling the officer that he would need to furnish additional probable cause to support a broader search. Id. This Court held that the judge did not abandon his judicial role and applied the good-faith exception. Id.

Other courts also have declined to apply the exclusionary rule in similar circumstances. See e.g., Medearis, 775 F. Supp. 2d at 1122-24 (collecting cases in which the good-faith exception was applied despite errors in the warrant issuing process). In Cazares-Olivas, an agent sought a telephonic warrant from a judge late at night, the judge recorded the conversation, swore the participants, questioned the agent, found probable cause, and authorized the search saying "the bottom line is you've got judicial authorization. It is so ordered. You can send your team in right now." 515 F.3d at 727. The judge did not read the proposed warrant, the warrant was not read to the judge, and the judge did not prepare and sign a warrant following the call. Id. at 728. The United States Court of Appeals for the Seventh Circuit assumed that the search was unconstitutional, but applied the good-faith exception because the defendant "received the benefit of a magistrate judge's impartial evaluation before the search occurred[,]" the search was supported by probable cause, the testimony was recorded, the officer was sworn, and the officer described with particularity the place to be searched and the things to be seized. Id. at 729-30.

Similarly in United States v. Negrete-Gonzales, 966 F.2d 1277 (9th Cir. 1992), agents sought a telephonic warrant, read the issuing judge the affidavit, and did not read the judge the search warrant. Id. at 1283. The judge then instructed the agents to draft a warrant consistent

35

with the affidavit and sign his name. Id. The United States Court of Appeals for the Ninth

Circuit held that this procedure "ran afoul of the constitutional prohibition against open ended

warrants[,]" but that the good-faith exception applied because the "agents followed the express

directions of the issuing judge." Id. The agents' mistaken belief in the validity of the improper

procedure to obtain a telephonic search warrant was objectively reasonable. Id.

The Eighth Circuit in Decker provides an alternative example of where the issuing judge

acted as a rubber stamp. 956 F.2d at 777-78. In Decker, the Eighth Circuit held that the district

court did not clearly err in determining the issuing judge failed to act as a detached and neutral

magistrate when the judge signed the warrant without reading it, failed to note that the prosecutor

had neglected to sign the warrant as local law required, and the warrant did not list the place to

be searched and property to be seized. Id. at 777. Further, the judge issued the search warrant

on the basis of what the officer told him, yet there was no indication that the officer was placed

under oath or that the testimony was recorded. See United States v. Seidel, 677 F.3d 334, 340

(8th Cir. 2012) (per curiam) (discussing Decker). The Eighth Circuit subsequently in Seidel,

observed that Decker stemmed from a "*compilation* of . . . facts [present in Decker] that led us

to conclude that 'the district court did not clearly err in determining that the issuing judge failed

to act in a detached and neutral manner.'" Id. (emphasis in original).

The Government for good reason has conceded that the manner by which Judge Miner

issued the warrant was constitutionally defective. Doc. 70 at 7-8 (asking this Court to consider

the issue under the good-faith exception). However, the question is whether the Leon good-faith exception applies. Judge Miner swore Officer Spargur who then read to her the relevant portions of his affidavit, including portions reproduced in the search warrant delineating the search's scope and items sought. The affidavit was consistent with his testimony and established probable cause for the warrant's issuance. Judge Miner listened to Officer Spargur, told him that he had established probable cause, and authorized the search. Officer Spargur's belief that the proper procedures were followed was objectively reasonable. The judge is the final reviewing official who "must shoulder the ultimate responsibility for the clerical error in the warrant." United States v. Berry, 113 F.3d 121, 124 (8th Cir. 1997). Officers such as Officer Spargur "are not ordinarily expected to question a [judge's] judgment as to a warrant's technical sufficiency." United States v. Hyten, 5 F.3d 1154, 1156 n.5 (8th Cir. 1993). The absence of certain procedures safeguarding the integrity of the warrant issuing process do not make the Leon good-faith exception inapplicable. As far as the absence of a recording, the Fourth Amendment does not require a contemporaneous recording, Cote, 569 F.3d at 392-93, although "it is at all times preferable to record testimony given before a magistrate to supplement an affidavit . . . ," United States v. Berkus, 428 F.2d 1148, 1152 (8th Cir. 1970). Of course, if the Lower Brule Sioux Tribe police obtain from Judge Miner again a telephonic warrant upon reading only a portion of the supporting documents and without a recording, the outcome of a motion to suppress may well be different as it would be more difficult to justify application of the good-faith exception

37

on a subsequent occasion.

Long next argues under Leon's second exception that Judge Miner was not acting as a neutral and detached magistrate, both because of her role on the judicial council and because of her alleged bias against Long. Doc. 69 at 5 (citing Coolidge v. New Hampshire, 403 U.S. 443 (1971)); Doc. 29 at 10-11. Cases addressing when a magistrate lacks neutrality and detachment fall into two categories. United States v. Harris, 566 F.3d 422, 433 (5th Cir. 2009). The first category is where the magistrate is not "independent of the police and prosecution[.]" United States v. Lucas, 499 F.3d 769, 775 (8th Cir. 2007) (en banc) (quoting Shadwick v. City of Tampa, 407 U.S. 345, 348 (1972)); see also Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326 (1979) (holding judge lacked neutrality and detachment when he participated in the search); Coolidge v. New Hampshire, 403 U.S. 443, 449-53 (1971) (holding issuing magistrate was not neutral because he was also the state attorney general who was investigating and prosecuting the case). The second category is where the issuing judge had an interest in seeing the warrant issue. See Connally v. Georgia, 429 U.S. 245, 251 (1977) (per curiam) (holding magistrate lacked neutrality because he had a pecuniary interest in seeing the warrant issue); Tumey v. State of Ohio, 273 U.S. 510, 523 (1927) ("But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case."); Harris, 566 F.3d at 433-34 (holding

38

that issuing judge was neutral and detached because he had no pecuniary interest in seeing the

warrant issue and the defendant presented no evidence of bias or prejudice); United States v.

Barry-Scott, 251 F. App'x 983, 993 (6th Cir. 2007) (rejecting allegation that judge lacked

neutrality because the defendant did not show "that the judge had a personal, pecuniary or

substantial interest in the outcome of the search or that he was too closely tied to the functions

of law enforcement"); Mathison, 157 F.3d at 548 (holding that defendant failed to show that the

judge was personally biased against him by not establishing "facts that could lead a reasonable

person to believe that [the judge] was unable to assess impartially the existence of probable

cause");[11] Johnson, 504 F. Supp. 2d at 565 (stating that judge was neutral because he did not

---

[11] Mathison and the case it cites for support—United States v. DeLuna, 763 F.2d 897 (8th Cir. 1985)—draw their standard from 28 U.S.C. § 455(a), the federal recusal statute. Deluna, 763 F.2d at 907 (citing § 455(a)). Both of these cases involved federal magistrate judges. Other courts have held that the standard in § 455(a) does not apply when a defendant is challenging the impartiality of a judge issuing a search warrant under the Fourth Amendment. Harris, 566 F.3d at 434 ("The statutory disqualification standard [is] more demanding than that required by the Due Process Clause and thus does not guide our constitutional analysis here.") (internal quotation marks omitted); United States v. Guthrie, 184 F. App'x 804, 807 (10th Cir. 2006) ("Because we conclude that recusal was not required, we express no opinion as to whether a violation of 28 U.S.C. § 455(a) also violates the Fourth Amendment's requirement that a neutral and detached magistrate issue a warrant."). Yet others have been unable to find authority that would apply § 455(a) to anyone other than federal judges. See United States v. Heffington, 952 F.2d 275, 278-79 (9th Cir. 1991) ("Womble has cited no authority for the proposition that 28 U.S.C. §§ 144 and 455 should guide the due process analysis of a search warrant issued by a state superior court judge."); United States v. Benais, Civil No. 13-192 (1) (RHK/LIB), 2013 WL 6078891 (D. Minn. Nov. 19, 2013) ("However, 28 U.S.C. § 455 applies specifically to federal judges. Defendant provides no authority, and the Court has identified none, that would suggest either that judges of [a tribal court] are bound by 28 U.S.C. § 455, or that the federal courts have extended 28 U.S.C § 455 jurisprudence to decisions made by tribal court judges.").

receive "any sort of benefit that would influence his decision"); 2 Wayne R. LaFave, Search & Seizure § 4.2(b) (5th ed. 2013) ("Sometimes the claim is that the magistrate, while not having a financial interest in the case, had a sufficient personal interest that he cannot be deemed to have been impartial.").

Judge Miner did not take on a law enforcement role, did not participate in the search or prosecution, and had no pecuniary or personal interest in seeing the warrant issue. Her participation in formulating certain laws while serving with other professionals on the Tribe's Committee is distinguishable from cases where a magistrate participated with police and prosecution to carry out their law enforcement functions. Being consulted on possible legislation is distinct from "essentially becoming a police officer in a robe." Scroggins, 361 F.3d at 1084. Judge Miner's familiarity with Long's business and reputation is not unusual in a small, rural community like Lower Brule and does not taint her consideration of issuance of a warrant. See Heffington, 952 F.2d at 279 ("Assuming that an appearance of partiality may lurk in the fact that judges and police officers in rural counties often know more about the local criminal recidivists do than their more urban colleagues, we are not prepared to disqualify small-town judges on demand."). It is disconcerting that Judge Miner previously had debarred defendants on pretrial release from entry into the OC Store, but she did so only after the question arose whether defendants debarred from patronizing businesses selling synthetic marijuana could be at the OC Store. Judge Miner testified that she issued the warrant solely on the information contained in

40

the affidavit and not on a preconceived notion of Long's guilt. Tr. 52. The affidavit supported

the existence of probable cause, and Long does not allege that Judge Miner or Officer Spargur

acted intentionally or in bad faith.

Even if Judge Miner were biased, the Leon good-faith exception would appear to apply.

The Eighth Circuit has not addressed whether the officer must have knowledge that the issuing

judge lacked neutrality to prevent application of the good-faith exception, but other courts have

so held. In United States v. Czuprynski, 46 F.3d 560 (6th Cir. 1995), the United States Court of

Appeals for the Sixth Circuit held that even if the judge lacked neutrality due to a prior dispute

with the defendant, the good-faith exception applied because the officer lacked knowledge of the

dispute rendering the judge less than neutral when he sought the warrant. Id. at 564; see also

United States v. Breckenridge, 782 F.2d 1317, 1321-22 (5th Cir. 1986) (applying the good-faith

exception when the issuing judge did not perform his role because the judge "appeared . . . to

have fulfilled his duty"); 1 LaFave, Search & Seizure § 1.3(f) ("Leon recognizes only deterrence

of the police, and that kind of deterrence only where the police acted unreasonably, and this

means that the circumstances showing the magistrate has 'wholly abandoned his judicial role'

must have been known by (or, at least reasonably knowable by) the police."). Thus, even if

Judge Miner lacked neutrality regarding Long, the good faith exception would apply under this

precedent because there is no evidence that Officer Spargur knew that Judge Miner arguably

lacked neutrality.

Long asserts under <u>Leon</u>'s fourth exception that the warrant was facially deficient because of the abundant procedural errors. Doc. 69 at 7. <u>Leon</u>'s fourth exception applies when a warrant fails to describe with sufficient particularity the place to be searched or the things to be seized such that an officer could not in good faith believe the warrant is valid. <u>Hessman</u>, 369 F.3d at 1023; <u>see also</u> <u>United States v. Moore</u>, 41 F.3d 370, 376 (8th Cir. 1994). The cases to which Long cites for support are inapplicable.[12] These cases do not address <u>Leon</u>'s fourth exception; they address when procedural errors constitute a Fourth Amendment violation.

## C. Vehicle Search

Long objected to Judge Moreno's conclusion that Long could not challenge the search of the Trailblazer because he lacked a reasonable expectation of privacy in it. Doc. 89 at 3-4. "Fourth Amendment rights are personal . . . [and] may not be vicariously asserted." <u>United States v. Douglas</u>, 744 F.3d 1065, 1071 (8th Cir. 2014) (quoting <u>Alderman v. United States</u>, 394

---

[12] Long's Supplemental Memorandum, Doc. 69 at 7, first cites to <u>State v. Myers</u>, 815 P.2d 761 (Wash. 1991), in which the Supreme Court of Washington held that a failure to record a conversation upon which a warrant was issued constituted a Fourth Amendment violation unless the judge could reconstruct the recording in a manner that does not impair a court's review. <u>Id.</u> at 765-68. This holding is contrary to the law within the Eighth Circuit. <u>See</u> <u>Cote</u>, 569 F.3d at 392-93; <u>see also</u> <u>United States v. Clyburn</u>, 24 F.3d 613, 617 (4th Cir. 1994). Long next cites to <u>United States v. Shorter</u>, 600 F.2d 585 (6th Cir. 1979), in which the United States Court of Appeals for the Sixth Circuit held that a judge's failure to place the affiant immediately under oath was a constitutional violation which merited suppression. <u>Id.</u> at 588-89. Here, Long does not argue any problems with the oath or affirmation requirement. Finally, Long cites to <u>United States v. Freeman</u>, 897 F.2d 346 (8th Cir. 1990), in which the Eighth Circuit addressed the issue of "whether the application for a warrant by an unauthorized person triggers application of the exclusionary rule." <u>Id.</u> at 349-50. The case that <u>Freeman</u> cites to for support—<u>United States v. Luk</u>, 859 F.2d 667 (9th Cir. 1988)—held that even if a constitutionally significant violation of Rule 41 occurred, the good-faith exception can apply. <u>Id.</u> at 674-76.

U.S. 165, 174 (1969)). A person's "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). "[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." Mendoza, 281 F.3d at 715 (quoting United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999)). Several factors are relevant to determining whether a person has a legitimate expectation of privacy: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." Id. (quoting McCaster, 193 F.3d at 933.

Long argues that "the search ran afoul of the Fourth Amendment because [the search] took place on the [curtilage] of Long's home." Doc. 89 at 3-4 (arguing "regardless of whether Long had a reasonable expectation of privacy in [the Trailblazer], he does have a reasonable expectation of privacy in his [curtilage]").[13] Long argues this situation is akin to the police entering a homeowner's attached garage in order to search a car parked therein without a warrant. Doc. 89 at 3. Long cites to United States v. Wells, 648 F.3d 671 (8th Cir. 2011), which stands

---

[13] Long, however, does not argue that his "commercial curtilage" was invaded. See e.g., United States v. Hall, 47 F.3d 1091, 1097 (11th Cir. 1995).

for the uncontroversial proposition that a person has a legitimate expectation of privacy in the curtilage surrounding one's own home. Id. at 674-75. Other cases lend support for the proposition that a homeowner may have an expectation of privacy in an item searched when that item is owned by a third party, but searched while the item was at the defendant's home or within its curtilage. See United States v. Gomez, 276 F.3d 694, 697-98 (5th Cir. 2001) (holding that homeowner could challenge search of a rental truck rented by a third party but parked on his driveway because the evidence was on his home property and the evidence "was known to him because it was the subject of an unlawful enterprise"); United States v. Perez, 700 F.2d 1232, 1236 (8th Cir. 1983) (holding that defendant had legitimate expectation of privacy in luggage belonging to his overnight guest when that luggage was searched within the defendant's home); cf. United States v. Garcia-Rosa, 876 F.2d 209, 219 (1st Cir. 1989) (holding defendant failed to meet his burden to establish a reasonable expectation of privacy in a box seized in his wife's clothing dresser because he disclaimed interest in the box and its contents), judgment vacated on other grounds by Rivera-Feliciano v. United States, 498 U.S. 954 (1990);United States v. Borno, 946 F. Supp. 972 (M.D. Fla. 1996) (holding two co-defendants could not challenge search of another co-defendant's vehicle even though that vehicle was searched while parked in the driveway and within the curtilage of a home in which all three co-defendants lived). However, none of these cases apply. The OC Store and the Sioux Boys building were not a home and Long is not a homeowner. The OC Store was a business and the Trailblazer was in its open,

44

unenclosed parking lot.

Even if the OC Store were a home, which it was not, the parking lot appears not to be within its curtilage. Curtilage is an area that is associated with the "intimate activity . . . of a man's home and the privacies of life[.]" Wells, 648 F.3d at 675. "The 'centrally relevant consideration' in any curtilage determination is 'whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection.'" Id. at 677 (quoting United States v. Dunn, 480 U.S. 294, 301 (1987). Four factors assist in determining whether an area is within a home's curtilage: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure that surrounds the home; (3) the nature of the uses to which the defendant puts the area; and (4) the steps taken by the resident to protect the area from people who pass. Id. (quoting Dunn, 480 U.S. at 301). Even with the first factor favoring Long's argument, the final three factors establish that a car in the parking lot outside of the OC Store is not within its protected curtilage. There is no evidence that the parking lot was enclosed, it was used by store patrons to park or walk through on their way into the store, and Long took no reasonable steps to protect the area from people, presumably because he wanted people to use the parking lot in patronizing his store.

Long also is incorrect that the proposition outlined in the "passenger" cases—that one must have a legitimate expectation of privacy in the specific area searched to vindicate a Fourth Amendment right—is inapplicable. Doc. 89 at 3. This point of law is applied routinely outside

45

the passenger or car search context. See e.g., Douglas, 744 F.3d at 1069-72 (holding that defendant must establish a legitimate expectation of privacy to challenge the search of a bag found on real property in which the defendant had no interest); Mendoza, 281 F.3d at 715 (holding that defendant must show reasonable expectation of privacy to challenge the search of a common area in his multi-family dwelling); United States v. Sturgis, 238 F.3d 956, 958-59 (8th Cir. 2001) (holding that defendant must show legitimate expectation of privacy to challenge the search of a hotel room that he was not renting). Long has presented neither evidence of an ownership or possessory interest in the Trailblazer, nor evidence to support any of the factors outlined in Mendoza. Indeed, Long has disclaimed interest in the Trailblazer's contents. Judge Moreno's Report and Recommendation properly found that Long has no reasonable expectation of privacy in the Trailblazer and could not object to its search.

## D. August 6, 2012 Entry and Seizure of FedEx Box

Long objects to Judge Moreno's conclusion that Officer La Mons's warrantless entry at the invitation of Rae Lynn and Brouse into the Sioux Boys building on August 6, 2012 was constitutional. Doc. 89 at 5. Long raises the same argument in the same form here that he raised before Judge Moreno—that Officer La Mons's entry at the invitation of Rae Lynn and Brouse ostensibly was based on a mistaken belief that a landlord can provide valid consent to search a tenant's property. Compare Doc. 69 at 10-12, with Doc. 89 at 5-6. This Court has reviewed the record and Judge Moreno's legal analysis and adopts Judge Moreno's Recommendation

46

regarding Officer La Mons's warrantless entry on August 6, 2012. In short, Rae Lynn as manager and Brouse as owner of the building had both actual and apparent authority to permit Officer La Mons's entry and search.

Long next argues that even if the entry was constitutional, Officer La Mons did not have authority to seize the FedEx box because "Officer La Mons had actual knowledge . . . that the [FedEx box] was not Justin Brouse's property" and because Brouse lacked authority to consent to its search. Doc. 89 at 9. Long analogizes this case to United States v. James, 353 F.3d 606 (8th Cir. 2003). In James, the Eighth Circuit confronted the question of "under what circumstances do law enforcement officers have a reasonable perception that a third person has the authority of the owner to allow officers to inspect the contents of [an item] entrusted to him by the owner?" Id. at 610. The Eighth Circuit held that "although a *bailee* of a concealed item may have potential access to the inner contents of the item (he can pick the lock; break the seal; open the storage bin), this kind of access does not mean the *bailee* has actual authority to look at the contents of the items, or to consent to another's searching them." Id. at 614 (emphasis added). The bailee also lacked apparent authority to provide valid consent because the detectives knew the bailee's only authority was to destroy the item. Id. at 615.

James does not apply because there is no evidence that Brouse was Long's bailee. A bailee is "a person who receives personal property from another, and has possession of but not title to the property" and "is responsible for keeping the property safe until it is returned to the

47

owner." Black's Law Dictionary, 161 (9th ed. 2009). Long did not entrust the FedEx box to Brouse; he appears to have left it there after he was in the building without a legal right to be there. Rae Lynn and Brouse, the owner of the Sioux Boys building, called to report a burglary, invited in Officer La Mons, told Officer La Mons that the FedEx box, among other items, was not present when they left, and implied the box belonged to Long. Officer La Mons seized the FedEx box as evidence of a possible burglary or trespassing.

### E. August 6, 2012 Statements

#### 1. Statements to Officer La Mons

Long objects to Judge Moreno's conclusion that Officer La Mons's initial, pre-arrest question to Long of "Hey, you got that witness statement?" was not in violation of Miranda. Doc. 74 at 24-25; Tr. 170. Miranda requires "that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (emphasis in original). Because Miranda warnings are meant to protect the individual against the coercive aspects of a "custodial interrogation," the warnings are required "only where there has been such a restriction on a person's freedom as to render him in custody." J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011) (internal quotation marks omitted). The Supreme Court provided the following analytical approach for custody determinations:

48

> Two discrete inquiries are essential to the
> determination: first, what were the circumstances
> surrounding the interrogation; and, second, given
> those circumstances, would a reasonable person
> have felt he or she was at liberty to terminate the
> interrogation and leave. Once the scene is set and
> the players' lines and actions are reconstructed,
> the court must apply an objective test to resolve
> the ultimate inquiry: was there a formal arrest or
> restraint on freedom of movement of the degree
> associated with formal arrest.

Id. (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)) (internal quotation marks omitted);

see also United States v. Vinton, 631 F.3d 476, 481 (8th Cir. 2011).

The Eighth Circuit in Griffin, identified the following six factors to consider when

determining if the person was in custody:

> (1) whether the suspect was informed at the time
> of questioning that the questioning was voluntary,
> that the suspect was free to leave or request the
> officers to do so, or that the suspect was not
> considered under arrest; (2) whether the suspect
> possessed unrestrained freedom of movement
> during questioning; (3) whether the suspect
> initiated contact with authorities or voluntarily
> acquiesced to official requests to respond to
> questions; (4) whether strong arm tactics or
> deceptive stratagems were employed during
> questioning; (5) whether the atmosphere of the
> questioning was police dominated; or, (6) whether
> the suspect was placed under arrest at the
> termination of the questioning.

922 F.2d at 1349. These factors "are not by any means exclusive" and "'custody' cannot be

resolved merely by counting up the number of factors on each side of the balance and rendering

a decision accordingly." United States v. Lowen, 647 F.3d 863, 867 (8th Cir. 2011) (quoting

United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004)).   Rather, after looking at the

factors, the inquiry remains whether there was a restraint on the defendant's freedom of

movement as if he were under formal arrest. United States v. Holleman, 743 F.3d 1152, 1159

(8th Cir. 2014).

  "The most obvious and effective means of demonstrating that a suspect has not been

taken into custody . . . is for the police to inform the suspect that an arrest is not being made and

that the suspect may terminate the interview at will."   Griffin, 922 F.2d at 1349 (internal

quotation marks omitted); see also Czichray, 378 F.3d at 826 (observing that no governing

precedent from the Supreme Court or the Eighth Circuit has found that a suspect was in custody

after he was "clearly advised of his freedom to leave or terminate questioning").   Officer La

Mons did not advise Long that he was free to leave or terminate the interview and that he was

not under arrest. Thus, the first factor suggests that Officer La Mons was conducting a custodial

interview of Long.   While the first factor is important in evaluating whether a suspect is in

custody, see Czichray, 378 F.3d at 826, failing to advise the defendant he is not under arrest and

free to terminate the interview is not dispositive of custody, Lowen, 647 F.3d at 868.

  The second factor mitigates against custody because Long was questioned without any

restraints and near his home.   See Czichray, 378 F.3d at 826 ("When a person is questioned on

50

his own turf . . . , we have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (internal quotation marks and citations omitted); United States v. Axsom, 289 F.3d 496, 502 (8th Cir. 2002). The very brief discussion occurred in the open air near a police car outside of Long's home, and Long was free to move about.

This Court considers the third factor to weigh slightly in favor of custody. Long was not asked if he would consent to an interview; Officer Spargur told him that he "needed to talk" to Long. Long's conduct, however, indicates that he was willing to engage Officer Spargur. See Czichray, 378 F.3d at 829 ("[The defendant's] decision not to terminate the interview and to allow the interview to proceed to its closing suggests an exercise of free will, rather than restraint to a degree associated with formal arrest."); Axsom, 289 F.3d at 502 (holding that defendant's "extremely friendly and cooperative" conduct during the interview supported conclusion that he voluntarily acquiesced to the interview). Long willingly left his house, voluntarily answered Officer La Mons's one question, and continued to speak to Officer La Mons after his arrest.

The fourth and fifth Griffin factors indicate a lack of custody. Officer La Mons was alone, he and Long knew one another, the two spoke in the open air by the police cruiser outside of Long's house, Officer La Mons asked just a single question, and the encounter was brief and non-confrontational. The sixth factor weighs in favor of custody because Long was arrested after he admitted to the alleged burglary or trespass.

51

Under the totality of the circumstances, this Court agrees with Judge Moreno that a reasonable person in Long's position would have felt free to terminate the interview and tell Officer La Mons to leave. See Vinton, 631 F.3d at 479-81 (upholding district court determination that the suspect would have felt at liberty to tell officers to leave when he made statements during a short interview conducted while he was unrestrained in his own home, uncoerced, but it did not appear that he was informed that he was free to terminate the interview); United States v. Flores-Sandoval, 474 F.3d 1142, 1144, 1147 (8th Cir. 2007) (holding that defendant was not in custody when federal agent questioned suspect on street after he was released from prison, did not advise he was free to terminate interview, and arrested the suspect at the conclusion of the brief interview). The circumstances surrounding his discussion with Officer La Mons did not "present a serious danger of coercion" as presented by the "station house" questioning at issue in Miranda. Howes v. Fields, 132 S. Ct 1181, 1189 (2012). Indeed, Officer La Mons asked just a single question and Long's incriminating statements were not solicited by questioning but rather from Long freely talking in front of his home.

Long next objected to Judge Moreno's conclusion that Long's statements to Officer La Mons after his arrest were not in violation of Miranda. Doc. 89 at 10-11. Miranda applies to a "custodial interrogation." 384 U.S. at 444. A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Long's statements to Officer La

52

Mons were not the product of a "custodial interrogation." Officer La Mons did not initiate any

questioning of Long after he was placed in custody; Long talked, but not in response to

interrogation. Long's argument that his post-arrest statements were in response to Officer La

Mons's original, pre-custody question similarly is contrary to what occurred factually. Officer

La Mons's decision not to give Long his Miranda warnings at the time of his arrest perhaps was

careless, but not unconstitutional.

## 2. Statements to Agent Yellow

Long objects generally and without specificity to Judge Moreno's Recommendation that

Agent Yellow did not violate Long's Miranda rights. See Doc. 89 at 11. Despite the objection's

general nature, this Court reviews this issue de novo. See United States v. Malcom, No.

CR11-3057-MWB, 2012 WL 2428209, at *5 (N.D. Iowa June 26, 2012).

This Court has made a de novo review of the record, including listening to the recorded

interview. This Court adopts Judge Moreno's Recommendation that Long's statements to Agent

Yellow need not be suppressed. Long was given his Miranda warnings, effectively waived those

rights, and did not unambiguously invoke his right to cut off questioning.

An accused who wishes to invoke his right to remain silent "must do so unambiguously."

Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (citation omitted). An invocation of the right

to remain silent is unambiguous if the accused said that he "wanted to remain silent or that he

did not want to talk with the police." Id. at 382. "Although a suspect need not speak with the

discrimination of an Oxford don, . . . he must articulate his desire [to invoke his <u>Miranda</u> rights]
sufficiently clearly that a reasonable officer in the circumstances would understand the statement
to be a request" to invoke a <u>Miranda</u> right. <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994)
(internal quotation marks and citation omitted); <u>see also</u> <u>United States v. Plugh</u>, 648 F.3d 118,
124 (2nd Cir. 2011) ("[T]he <u>Berghuis</u> Court made clear that for a defendant successfully to
invoke his <u>Miranda</u> rights, he must do so through a clear, unambiguous affirmative action or
statement."); <u>United States v. Johnson</u>, 56 F.3d 947, 955 (8th Cir. 1995) ("To adequately invoke
[the right to cut off questioning], a suspect must indicate 'a clear, consistent expression of a
desire to remain silent.'" (quoting <u>United States v. Thompson</u>, 866 F.2d 268, 272 (8th Cir.
1989))).

Judge Moreno correctly determined that Long never unambiguously invoked his right to
cut off questioning. At one point, Long asked Agent Yellow if he "could go back?" That
question in and of itself is not a clear invocation of his right to remain silent. Agent Yellow
responded that Long could go back and asked whether he wanted to be done speaking. Agent
Yellow was not required to ask a clarifying question in the face of an ambiguous declaration,
<u>Berghuis</u>, 560 U.S. at 581, but it was prudent for him to do so, <u>Johnson</u>, 56 F.3d at 955
(commending officer for asking clarifying questions). Long chose not to clarify his request but
instead continued talking. Agent Yellow signaled for a jailer and then asked Long yet again
whether he wanted to be done speaking. Long again chose not to cut off questioning and re-

54

engaged Agent Yellow. This Court adopts Judge Moreno's Recommendation finding that Agent

Yellow did not violate Long's <u>Miranda</u> rights.

Long's objection to this portion of the interrogation as fruit of the poisonous tree

stemming from Officer Spargur's warrantless entry is overruled based on this Court's holding

that the entry was permissible, <u>see</u> <u>supra</u> Section III.A-B.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Report and Recommendation Concerning Motion to Suppress, Doc.

74, is adopted in part. It is further

ORDERED that the Defendant's Objections to Report and Recommendation, Doc. 89,

are overruled. It is further

ORDERED that the Government's Objection to Report and Recommendation, Doc. 90,

is sustained. It is finally

ORDERED that the Defendant's Motion to Suppress Evidence, Doc. 28, is denied.

Dated June 6th, 2014.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

55